# EXHIBIT 4

# CANTELME & BROWN, P.L.C.

A Professional Liability Company
2020 S. McClintock Drive, Suite 109
Tempe, Arizona 85282
Tel (602) 200-0104   Fax (602) 200-0106
david@cb-attorneys.com /aaron@cb-attorneys.com

David J. Cantelme, Bar No. 006313
D. Aaron Brown, Bar No. 022133
*Attorneys for Plaintiffs*

## SUPERIOR COURT OF ARIZONA

## MARICOPA COUNTY

| | |
|---|---|
| LILLIAN COCREHAM, an unmarried woman, and as the sole surviving statutory beneficiary of Emmett Cocreham and George Cocreham,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF PHOENIX, an Arizona municipal corporation; JERI WILLIAMS and CODY WILLIAMS, husband and wife; ADRIAN JUAREZ, an unmarried man; NETHANIEL BULL and MONICA BULL, husband and wife; DANIEL JAMES FITZGERALD and CARISSA FITZGERALD, husband and wife; LAKER DOHAN, an unmarried man; JEFFREY LOSON HAM, an unmarried man; TERRENCE FAY and JENNIFER FAY, husband and wife; TYLER KIPPER and CHELSEA KIPPER, husband and wife; ERIC MINER and ADRIANA MINER, husband and wife; BRIAN WOOD and AMY WOOD, husband and wife; and JOSEPH MILLS, an unmarried man; DONALD PEELMAN and LYNETTE PEELMAN, husband and wife; RONALD DORFMAN an unmarried man; GERALD HAPPENY | Case No.: CV2021-012234<br><br>**SECOND AMENDED COMPLAINT**<br><br>Tier 3<br><br>Assigned to the Hon Joan Sinclair |

and REBECCA HAPPENY, husband and wife; and MICHAEL BURNS and REGINA BURNS, husband and wife; JAMES SMOKE and KRISTEN SMOKE, husband and wife; RICHARD HAWKINS, II and ANNAMARIE HAWKINS, husband and wife; and JOHN DOES 1-10,

Defendants.

Pursuant to Rule 10(d), Ariz.R.Civ.P., and the stipulation of all parties, Plaintiff Lillian Cocreham ("Ms. Cocreham") amends her complaint and alleges as follows:

## NATURE OF THE ACTION

1.     This action stems from the horrific and senseless shootings and killings of George Cocreham and Emmett Cocreham, Ms. Cocreham's two adult sons, on the night of October 20, 2020.  The Maricopa County Medical Examiner classified both deaths as homicides.  No justification for the shootings or killings is found in Title 13, ch. 4, Ariz.Rev.Stat., or in the City of Phoenix's own Use of Force policy.

2.     Ms. Cocreham brings this action to recover the wrongful death and related damages proximately caused her by Defendants when they responded to a service call to her residence on October 20, 2020.

## PARTIES, JURISDICTION, AND VENUE

3.     Ms. Cocreham is a widow who resides at 2210 E. Amelia Avenue, Phoenix, Arizona 85016.

4.     Ms. Cocreham is the sole, surviving parent of Emmett Cocreham ("Emmett"), decedent.  Emmett was never married and had no children.  Pursuant to A.R.S. §§ 12-611 through 12-613, Ms. Cocreham brings this action for the wrongful death of Emmett.

5. Ms. Cocreham is the sole, surviving parent of George Cocreham ("George"), decedent. George was never married and had no children. Pursuant to A.R.S. §§ 12-611 through 12-613, Ms. Cocreham brings this action for the wrongful death of George.

6. Defendant City of Phoenix is an Arizona municipal corporation.

7. Upon information belief, Defendants Chief Jeri Williams ("Chief Williams") and Cody Williams are wife and husband and reside within Maricopa County, Arizona. At all times material to this action, Chief Williams acted on behalf of her marital community, and her marital community is bound by her acts and omissions and is liable for the damages she caused, all as alleged herein. Upon information and belief, at all times material to this action, Chief Williams served as an employee and Chief of the Phoenix Police Department, and Ms. Cocreham names her as a defendant in her official capacity as well as individually and as a member of her marital community. Upon information and belief, at times, as alleged herein, Chief Williams acted within her official capacity and scope of employment, and to that extent the City of Phoenix is bound by her acts or omissions and is liable for the damages she caused, all as alleged herein. Upon information and belief, at other times and as alleged herein, Chief Williams acted illegally and outside of her official capacity and scope of employment, and to the extent Chief Williams and her marital community are personally liable for the damages she caused as alleged herein and she is not entitled to immunity for her actions in such instance.

8. Upon information and belief, Defendant Adrian Juarez resides within Maricopa County, Arizona. Upon information and belief, at all times material to this action, Defendant Juarez served as an employee and officer of the Phoenix Police Department, and Ms. Cocreham names him as a defendant in his official capacity as well as individually. Upon information and belief, at times, as alleged herein, Defendant

Juarez acted within his official capacity and scope of employment, and to that extent the City of Phoenix is bound by his acts or omissions and is liable for the damages he caused, all as alleged herein. Upon information and belief, at other times, as alleged herein, Defendant Juarez acted illegally and outside his official capacity and scope of employment, and to that extent Defendant Juarez is personally liable for the damages he caused as alleged herein, and he is not entitled to immunity for his actions in such instances.

9. Upon information and belief, Defendants Nethaniel Bull and Monica Bull are husband and wife and reside within Maricopa County, Arizona. At all times material to this action, Defendant Bull acted on behalf of his marital community, and his marital community is bound by his acts and omissions and is liable for the damages he caused, all as alleged herein. Upon information and belief, at all times material to this action, Defendant Bull served as an employee and officer of the Phoenix Police Department, and Ms. Cocreham names him as a defendant in his official capacity as well as individually and as a member of his marital community. Upon information and belief, at times, as alleged herein, Defendant Bull acted within his official capacity and scope of employment, and to that extent the City of Phoenix is bound by his acts or omissions and is liable for the damages he caused, all as alleged herein. Upon information and belief, at other times, as alleged herein, Defendant Bull acted illegally and outside his official capacity and scope of employment, and to that extent Defendant Bull and his marital community are personally liable for the damages he caused as alleged herein, and he is not entitled to immunity for his actions in such instances.

10. Upon information and belief, Defendants Daniel James Fitzgerald and Carissa Fitzgerald are husband and wife and reside within Maricopa County, Arizona. At all times material to this action, Defendant Fitzgerald acted on behalf of his marital community, and his marital community is bound by his acts and omissions and is liable

for the damages he caused, all as alleged herein. Upon information and belief, at all times material to this action, Defendant Fitzgerald served as an employee and officer of the Phoenix Police Department, and Ms. Cocreham names him as a defendant in his official capacity as well as individually and as a member of his marital community. Upon information and belief, at times, as alleged herein, Defendant Fitzgerald acted within his official capacity and scope of employment, and to that extent the City of Phoenix is bound by his acts or omissions and is liable for the damages he caused, all as alleged herein. Upon information and belief, at other times, as alleged herein, Defendant Fitzgerald acted illegally and outside his official capacity and scope of employment, and to that extent Defendant Fitzgerald and his marital community are personally liable for the damages he caused as alleged herein, and he is not entitled to immunity for his actions in such instances.

11. Upon information and belief, Defendant Laker Dohan resides within Maricopa County, Arizona. Upon information and belief, at all times material to this action, Defendant Dohan served as an employee and officer of the Phoenix Police Department, and Ms. Cocreham names him as a defendant in his official capacity as well as individually. Upon information and belief, at times, as alleged herein, Defendant Dohan acted within his official capacity and scope of employment, and to that extent the City of Phoenix is bound by his acts or omissions and is liable for the damages he caused, all as alleged herein. Upon information and belief, at other times, as alleged herein, Defendant Dohan acted illegally and outside his official capacity and scope of employment, and to that extent Defendant Dohan is personally liable for the damages he caused as alleged herein, and he is not entitled to immunity for his actions in such instances.

12. Upon information and belief, Defendant Jeffrey Loson Ham resides within Maricopa County, Arizona. Upon information and belief, at all times material to this

action, Defendant Ham served as an employee and officer of the Phoenix Police Department, and Ms. Cocreham names him as a defendant in his official capacity as well as individually. Upon information and belief, at times, as alleged herein, Defendant Ham acted within his official capacity and scope of employment, and to that extent the City of Phoenix is bound by his acts or omissions and is liable for the damages he caused, all as alleged herein. Upon information and belief, at other times, as alleged herein, Defendant Ham acted illegally and outside his official capacity and scope of employment, and to that extent Defendant Ham is personally liable for the damages he caused as alleged herein, and he is not entitled to immunity for his actions in such instances.

13. Upon information and belief, Defendants Terrence Fay and Jennifer Fay are husband and wife, and reside within Maricopa County, Arizona. At all times material to this action, Defendant Fay acted on behalf of his marital community, and his marital community is bound by his acts and omissions and is liable for the damages he caused, all as alleged herein. Upon information and belief, at all times material to this action, Defendant Fay served as an employee and officer of the Phoenix Police Department, and Ms. Cocreham names him as a defendant in his official capacity as well as individually and as a member of his marital community. Upon information and belief, at times, as alleged herein, Defendant Fay acted within his official capacity and scope of employment, and to that extent the City of Phoenix is bound by his acts or omissions and is liable for the damages he caused, all as alleged herein. Upon information and belief, at other times, as alleged herein, Defendant Fay acted illegally and outside his official capacity and scope of employment, and to that extent Defendant Fay and his marital community are personally liable for the damages he caused as alleged herein, and he is not entitled to immunity for his actions in such instances.

14. Upon information and belief, Defendants Tyler Kipper and Chelsea Kipper are husband and wife, and reside within Maricopa County, Arizona. At all times material

to this action, Defendant Kipper acted on behalf of his marital community, and his marital community is bound by his acts and omissions and is liable for the damages he caused, all as alleged herein.  Upon information and belief, at all times material to this action, Defendant Kipper served as an employee and officer of the Phoenix Police Department, and Ms. Cocreham names him as a defendant in his official capacity as well as individually and as a member of his marital community.  Upon information and belief, at times, as alleged herein, Defendant Kipper acted within his official capacity and scope of employment, and to that extent the City of Phoenix is bound by his acts or omissions and is liable for the damages he caused, all as alleged herein.  Upon information and belief, at other times, as alleged herein, Defendant Kipper acted illegally and outside his official capacity and scope of employment, and to that extent Defendant Kipper and his marital community are personally liable for the damages he caused as alleged herein, and he is not entitled to immunity for his actions in such instances.

15.     Upon information and belief, Defendants Eric Miner and Adriana Miner are husband and wife, and reside within Maricopa County, Arizona.  At all times material to this action, Defendant Miner acted on behalf of his marital community, and his marital community is bound by his acts and omissions and is liable for the damages he caused, all as alleged herein.  Upon information and belief, at all times material to this action, Defendant Miner served as an employee and officer of the Phoenix Police Department, and Ms. Cocreham names him as a defendant in his official capacity as well as individually and as a member of his marital community.  Upon information and belief, at times, as alleged herein, Defendant Miner acted within his official capacity and scope of employment, and to that extent the City of Phoenix is bound by his acts or omissions and is liable for the damages he caused, all as alleged herein.  Upon information and belief, at other times, as alleged herein, Defendant Miner acted illegally and outside his official capacity and scope of employment, and to that extent Defendant Miner and his marital

community are personally liable for the damages he caused as alleged herein, and he is not entitled to immunity for his actions in such instances.

16. Upon information and belief, Defendants Brian Wood and Amy Wood are husband and wife, and reside within Maricopa County, Arizona. At all times material to this action, Defendant Wood acted on behalf of his marital community, and his marital community is bound by his acts and omissions and is liable for the damages he caused, all as alleged herein. Upon formation and belief, at all times material to this action, Defendant Wood served as an employee and officer of the Phoenix Police Department, and Ms. Cocreham names him as a defendant in his official capacity as well as individually and as a member of his marital community. Upon information and belief, at times, as alleged herein, Defendant Wood acted within his official capacity and scope of employment, and to that extent the City of Phoenix is bound by his acts or omissions and is liable for the damages he caused, all as alleged herein. Upon information and belief, at other times, as alleged herein, Defendant Wood acted illegally and outside his official capacity and scope of employment, and to that extent Defendant Wood and his marital community are personally liable for the damages he caused as alleged herein, and he is not entitled to immunity for his actions in such instances.

17. Upon information and belief, Defendant Joseph Mills resides within Maricopa County, Arizona. Upon information and belief, at all times material to this action, Defendant Mills served as an employee and officer of the Phoenix Police Department, and Ms. Cocreham names him as a defendant in his official capacity as well as individually. Upon information and belief, at times, as alleged herein, Defendant Mills acted within his official capacity and scope of employment, and to that extent the City of Phoenix is bound by his acts or omissions and is liable for the damages he caused, all as alleged herein. Upon information and belief, at other times, as alleged herein, Defendant Mills acted illegally and outside his official capacity and scope of employment, and to

that extent Defendant Mills is personally liable for the damages he caused as alleged herein, and he is not entitled to immunity for his actions in such instances.

18.     Upon information and belief, Defendants Donald Peelman and Lynette Peelman are husband and wife, and reside within Maricopa County, Arizona.  At all times material to this action, Defendant Peelman acted on behalf of his marital community, and his marital community is bound by his acts and omissions and is liable for the damages he caused, all as alleged herein.  Upon information and belief, at all times material to this action, Defendant Peelman served as an employee and officer of the Phoenix Police Department, and Ms. Cocreham names him as a defendant in his official capacity as well as individually and as a member of his marital community.  Upon information and belief, at times, as alleged herein, Defendant Peelman acted within his official capacity and scope of employment, and to that extent the City of Phoenix is bound by his acts or omissions and is liable for the damages he caused, all as alleged herein.  Upon information and belief, at other times, as alleged herein, Defendant Peelman acted illegally and outside his official capacity and scope of employment, and to that extent Defendant Peelman and his marital community are personally liable for the damages he caused as alleged herein, and he is not entitled to immunity for his actions in such instances.

19.     Upon information and belief, Defendant Ronald Dorfman resides within Maricopa County, Arizona.  Upon information and belief, at all times material to this action, Defendant Dorfman served as an employee and officer of the Phoenix Police Department, and Ms. Cocreham names him as a defendant in his official capacity as well as individually.  Upon information and belief, at times, as alleged herein, Defendant Dorfman acted within his official capacity and scope of employment, and to that extent the City of Phoenix is bound by his acts or omissions and is liable for the damages he caused, all as alleged herein.  Upon information and belief, at other times, as alleged herein, Defendant Dorfman acted illegally and outside his official capacity and scope of

employment, and to that extent Defendant Dorfman is personally liable for the damages he caused as alleged herein, and he is not entitled to immunity for his actions in such instances.

20.     Upon information and belief, Defendants Gerald Happeny and Rebecca Happeny are husband and wife, and reside within Maricopa County, Arizona.  At all times material to this action, Defendant Happeny acted on behalf of his marital community, and his marital community is bound by his acts and omissions and is liable for the damages he caused, all as alleged herein.  Upon information and belief, at all times material to this action, Defendant Happeny served as an employee and officer of the Phoenix Police Department, and Ms. Cocreham names him as a defendant in his official capacity as well as individually and as a member of his marital community.  Upon information and belief, at times, as alleged herein, Defendant Happeny acted within his official capacity and scope of employment, and to that extent the City of Phoenix is bound by his acts or omissions and is liable for the damages he caused, all as alleged herein.  Upon information and belief, at other times, as alleged herein, Defendant Happeny acted illegally and outside his official capacity and scope of employment, and to that extent Defendant Happeny and his marital community are personally liable for the damages he caused as alleged herein, and he is not entitled to immunity for his actions in such instances.

21.     Upon information and belief, Defendants Michael Burns and Regina Burns are husband and wife, and reside within Maricopa County, Arizona.  At all times material to this action, Defendant Burns acted on behalf of his marital community, and his marital community is bound by his acts and omissions and is liable for the damages he caused, all as alleged herein.  Upon information and belief, at all times material to this action, Defendant Burns served as an employee and officer of the Phoenix Police Department, and Ms. Cocreham names him as a defendant in his official capacity as well as individually and as a member of his marital community.  Upon information and belief, at

times, as alleged herein, Defendant Burns acted within his official capacity and scope of employment, and to that extent the City of Phoenix is bound by his acts or omissions and is liable for the damages he caused, all as alleged herein. Upon information and belief, at other times, as alleged herein, Defendant Burns acted illegally and outside his official capacity and scope of employment, and to that extent Defendant Burns and his marital community are personally liable for the damages he caused as alleged herein, and he is not entitled to immunity for his actions in such instances.

22. Upon information and belief, Defendants James Smoke and Kristen Smoke are husband and wife, and reside within Maricopa County, Arizona. At all times material to this action, Defendant Smoke acted on behalf of his marital community, and his marital community is bound by his acts and omissions and is liable for the damages he caused, all as alleged herein. Upon information and belief, at all times material to this action, Defendant Smoke served as an employee and officer of the Phoenix Police Department, and Ms. Cocreham names him as a defendant in his official capacity as well as individually and as a member of his marital community. Upon information and belief, at times, as alleged herein, Defendant Smoke acted within his official capacity and scope of employment, and to that extent the City of Phoenix is bound by his acts or omissions and is liable for the damages he caused, all as alleged herein. Upon information and belief, at other times, as alleged herein, Defendant Smoke acted illegally and outside his official capacity and scope of employment, and to that extent Defendant Smoke and his marital community are personally liable for the damages he caused as alleged herein, and he is not entitled to immunity for his actions in such instances.

23. Upon information and belief, Defendants Richard Hawkins II and Annamarie Hawkins are husband and wife, and reside within Maricopa County, Arizona. At all times material to this action, Defendant Hawkins acted on behalf of his marital community, and his marital community is bound by his acts and omissions and is liable

for the damages he caused, all as alleged herein.  Upon information and belief, at all times material to this action, Defendant Hawkins served as an employee and officer of the Phoenix Police Department, and Ms. Cocreham names him as a defendant in his official capacity as well as individually and as a member of his marital community.  Upon information and belief, at times, as alleged herein, Defendant Hawkins acted within his official capacity and scope of employment, and to that extent the City of Phoenix is bound by his acts or omissions and is liable for the damages he caused, all as alleged herein. Upon information and belief, at other times, as alleged herein, Defendant Hawkins acted illegally and outside his official capacity and scope of employment, and to that extent Defendant Hawkins and his marital community are personally liable for the damages he caused as alleged herein, and he is not entitled to immunity for his actions in such instances.

24.     Defendants JOHN DOES 1-10 and JANE DOES 1-10 are persons, incorporated or unincorporated business entities or associations, or Arizona public jural entities, whose true names currently are unknown to Ms. Cocreham, but who, by action or by omission when they had a duty to act, caused or contributed to Ms. Cocreham's damages, and therefore are liable to her as alleged herein.  Ms. Cocreham accordingly has designated them by fictitious names pursuant to Rule 10(d), Ariz.R.Civ.P.  Once Ms. Cocreham learns their true names and learns the extent of their involvement with regard to the facts which form the basis of this action, Ms. Cocreham will amend the amended complaint to name their true names, as provided in Rule 10(d).

25.     Defendants herein are jointly and severally liable as provided for under Arizona or federal law or both, based on the facts alleged below and based on the fact that the individual defendants, other than spouses, were acting in concert and were acting as agents or servants of the City of Phoenix.

26.     Venue is proper in Maricopa County under A.R.S. § 12-401.

27. This Court has jurisdiction of this action pursuant to ARIZ. CONST. art. 6, § 14 and A.R.S. § 12-123, and concurrent jurisdiction under 42 U.S.C. § 1983 of the claims made herein under federal law.

28. The Defendant employees and officers of the Phoenix Police Departments will be referred to herein collectively as Officers. Officers with supervisory positions and responsibilities are also referred to as Supervising Officers or Supervisors. As the context indicates, on occasion, Ms. Cocreham uses herein the term "PHX PD" and COP for short to refer to actions or omissions taken or refrained from respectively by the Officers or the City of Phoenix or any combination of them.

## CLAIM FOR ATTORNEYS' FEES

29. Ms. Cocreham is entitled to an award of reasonable attorneys' fees under 42 U.S.C. § 1988(b) and also A.R.S. §39-121.01.

## TIER ASSIGNMENT

30. As provided in Rule 8(b)(1), Ariz.R.Civ.P., no dollar amount or figure for damages is stated herein, but the minimum jurisdictional amount established for filing the action is satisfied herein, and the damages pleaded in this amended complaint qualify this action for Tier 3 under Rule 26.2(c)(3), Ariz.R.Civ.P.

## ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF

31. Within 180 days of October 20, 2020, Ms. Cocreham timely and properly served a notice of claim on all defendants covered by A.R.S. § 12-821.01 and has done all things necessary to satisfy A.R.S. § 12-821.01. By inaction, all defendants covered by A.R.S. § 12-821.01 have denied the claim.

32. Ms. Cocreham has satisfied all requirements and conditions, if any, to perfecting her right to file this action and to making the claims for relief pleaded in this amended complaint.

33.     As described herein, unless specifically alleged otherwise, the actions or omissions committed or refrained from by the Officers or each individually fell within the course and scope of their respective employment with the City of Phoenix and were taken under color of Arizona law, and conformed to the official policy, custom or practice of the City of Phoenix.

34.     Accordingly, such actions or omissions bind the City of Phoenix and render the City of Phoenix responsible and liable for same under the doctrines of agency, *respondeat superior*, and master/servant.   To the extent Ms. Cocreham claims the Officers, collectively or individually, acted outside the course and scope, Ms. Cocreham will so specify.

35.     On October 20, 2020, the Officers responded to a service call at 2210 East Amelia Avenue, Phoenix, Arizona 85016.  Ms. Cocreham owned this property on October 20, 2020, and still owns it.

36.     Just minutes after arriving, Officer Juarez shot and killed Emmett without justification.  Emmett was unarmed and doing nothing more than walking around in his backyard attempting to make sense of the chaos surrounding him when Officer Juarez leveled his rifle at Emmett, aimed at him, and shot him twice, once in the head and once in the neck, killing him instantly.

37.     Officer Dohan then shot George in the back, as George was retreating from the back patio into his house after seeing his brother fall dead from a shot to the head.  Like Officer Juarez, Officer Dohan shot George without justification.   The bullet punctured George's right lung, and it left him in acute danger of bleeding to death.

38.     Both shootings violated the Use of Force Policy set forth in the Phoenix Police Department's Operations Order 1.5, and highlight the ongoing policies, customs and practices by the City of Phoenix, the Phoenix Police Department, and its officers, of

using excessive force in the form of shooting first and asking questions later, and then failing to provide emergency aid when needed.

39.     In 2018, the Phoenix Police Department led the nation as the agency with the most fatal officer-involved-shooting incidents, with a total of 23 deaths that year. That same year, the Phoenix Police Department was involved in 44 officer-involved-shootings in total. Though the number decreased to 15 officer-involved shootings in 2019, in 2020 it spiked 73% to 26. Although the City of Phoenix has promised to reform this grim distinction of leading the nation in shootings, this case demonstrates that such reform has not yet occurred and may never occur within the foreseeable future.

40.     Despite knowing that George was unarmed, stunned, and disabled, and was bleeding profusely and was placed in mortal peril by the gunshot wound to his back, and despite knowing that the scene presented no danger to their personal safety, all of the Officers present at the scene, including Officers Peelman, Dorfman, Burns, and Smoke, and also Lieutenant Eric Miner, who refused to allow a fellow officer from seeking medical attention for George, allowed George to bleed to death while they watched, offering no emergency aid or meaningful assistance of any kind for nearly an hour after he was shot. The Officers present at the scene could have saved George's life had they timely rendered aid and summoned an ambulance to transport him to a hospital emergency room.

41.     Three Level 1 trauma hospitals were located within four miles and at most ten minutes of the Cocreham home: Valleywise Health Medical Center at 2601 E. Roosevelt Street, Banner University Medical Center at 1111 E. McDowell Road, and St. Joseph's Hospital and Medical Center at 350 W. Thomas Road, all in Phoenix. It should be further noted that Phoenix Fire Station No. 61 is located at 1925 E. Indian School Road, about three blocks from the Cocreham home. It would have taken one or two

minutes after dispatch for Phoenix Fire units to arrive on scene at the Cocreham house, from Station 61, and taken no more than ten minutes, and probably less at that hour of the night, for an ambulance to transport George to one of these Level 1 Trauma Centers.

42.    When the Officers finally elected to have Phoenix Fire Department personnel transport George to Valleywise Health Medical Center, it was too late. Valleywise Health Medical Center pronounced George dead at 9:58 p.m., on October 20, 2020.  The failure timely to render aid to George and timely to transport him to a hospital emergency room also violated the Use of Force Policy.

43.    The Phoenix Fire Department pronounced Emmett dead 13 minutes earlier, at 9:45 p.m. the same day, though he had lain dead on the ground for more than 30 minutes before the medics actually pronounced him dead.  Inexplicably, the Officers moved his lifeless body from the location where he fell dead to the alley way behind Ms. Cocreham's property.  Such conduct directly impacted the accuracy and credibility of the post-shooting investigation, which the Officers controlled.  They left his body in the alley behind the Cocreham house until after 5:30 a.m. the next morning.

44.    Consistent with Arizona law, having opted to respond to the subject call for help, the City of Phoenix and the Officers, and each of them, owed Emmett, George, and Ms. Cocreham a duty to act as would a reasonably careful and prudent police department/officer in the same circumstances.  As demonstrated in detail below, the Officers and the City of Phoenix breached such duty, which directly and proximately caused the damages suffered by Lillian Cocreham and the deaths of her sons, Emmett and George Cocreham.

45.    The deaths of her sons have left Ms. Cocreham isolated and alone.  She is approaching 65 years of age, suffers with chronic pain in her back, and has to depend on hired help for her daily needs.  Yet, the greatest pain that she suffers is the tragic and

needless loss of her sons. She has no one to give her love to, and she feels as though she has lost her purpose in life.

46. On October 20, 2020, at approximately 8:09 p.m., Ms. Cocreham called the Phoenix Police Department's non-emergency line to report that she was barricaded in her room and in fear for her safety because Emmett was threatening her.

47. Ms. Cocreham asked the Department to send a counselor to help mediate the dispute, as it had done in the past. The agent told Ms. Cocreham that the Department would send someone out to her home.

48. When no one showed up by 8:45 p.m., Ms. Cocreham called 911 and asked for help. Ms. Cocreham explained to the 911 operator that the family was in distress, suffering, and reliving the pain of the anniversary of her husband's death. She again asked the operator for a mediator to help calm her sons down.

49. The Officers responded to the dispatch. Rather than handle the disturbance in a reasonable and prudent manner, the Officers, including the Supervising Officers (Lieutenant Miner, Sergeant Kipper, Sergeant Mills, Sergeant-in-Training Wood, and Sergeant Fay), individually and collectively inflamed a domestic disturbance call into an unacceptably chaotic situation.

50. Such chaos set in motion the events that led to Officer Juarez shooting and killing Emmett, with no justification or immunity, Officer Dohan shooting George, with no justification or immunity, the failure of all Officers on the scene, identified below, to render aid to George and timely summon an ambulance to transport him to the Hospital, the Officers' utter indifference to whether George lived or died as he lay bleeding before them, and George's foreseeable and inexorable death, proximately caused by the gunshot and failure to render timely aid and transport.

51. George and Emmett never threatened the police and had no history of doing so. In his statement, Officer Juarez also said the Cocreham brothers were fighting on the

night of the incident.  That statement is false.  George and Emmett were not fighting, and the yelling they did at one another was to help each other survive the chaos, as evidenced in the police body cam recordings.

52.     Bill Martinez, Emmett and George's uncle, informed Officers David Rowley and Ronald Sandoval that this had happened before and that he had been able to calm the boys and defuse the situation.  This information fell on deaf ears.  Rather than employing common sense tactics to defuse and calm the situation, the Supervising Officers on the scene and the Officers under their command turned up the heat and brought chaos to the scene to the extent that Emmett, who moments before had raised his hands and turned in a circle with his hands in the air to show the officers in the alley that he was unarmed, was shot in the head from a distance of approximately 20 yards (hardly a long shot) and George was shot in the back attempting to retreat to the relative safety of his house after his brother Emmett was shot and killed.

53.     The two deaths resulted directly from the Supervising Officers' failure to gain command and control of the scene and of a non-combative situation well within their grasp, which they could have achieved with common sense, much less the training, skill, and knowledge police officers and their supervisors all should have before they put on the uniform and badge of office.

54.     The Officers in the alley were in direct communication with the Supervising Officers, and the evidence proves that the Supervising Officers had the opportunity and means of directing the conduct of these Officers.  Such conduct demonstrates that the City of Phoenix, through its Police Department, failed to adequately train the Supervisors and Officers to deal with this and similar situations, which are commonly encountered by law enforcement in the course of performing their work, and that such failure was a direct and proximate cause of the harm and damage that befell George, Emmett, and Ms. Cocreham.

55.     Officers Bull and Bendokaitis arrived at Ms. Cocreham's residence at approximately 8:53 p.m. on October 20, 2020.  Officer Bull was a field training officer and Officer Bendokaitis was in training.  When they arrived, Ms. Cocreham walked out her front door, met the Officers in her front yard, and explained to the them what was going on.

56.     Ms. Cocreham was taken down the block, well away from her home.  At this point, the only persons remaining at the Cocreham home were Emmett and George.

57.     The Officers moved away from the house and called for additional units, including a helicopter.  At approximately 9:01 p.m., a helicopter arrived above Ms. Cocreham's home and announced commands to "Walk out front with your hands up".  As the events progressed, the noise from the helicopter's blades and shouted commands from multiple officers added to the chaos and made it difficult, if not impossible, for George and Emmett to hear the commands being shouted at them by numerous Officers.

58.     Meanwhile, other Officers arrived at the alley behind the house, including Officer Fitzgerald and Officer Dohan, who exited their vehicle with their guns drawn.  Soon thereafter, Officer Fitzgerald left the alley and headed towards the front of the house but returned to the alley shortly thereafter.

59.     Rather than finding a safe barricade, as they should have been trained to do, Officer Dohan and Officer Fitzgerald positioned themselves behind a chain-link fence, which offered no meaningful protection.

60.     Officer Dohan had his police-issued AR-15 long gun pointed toward the house.  At that time, Emmett and George were walking back and forth between the backyard patio and the house.  At one point both Emmett and George were standing behind the house, and George told Emmett to go back inside.  Officer Dohan yelled toward the house, "Let me see your hands!" and "Drop the gun!"  Critically, even though Officers have alleged it, not one video produced by the City of Phoenix shows either

George or Emmett holding a firearm. Nor was there any evidence that either George or Emmett fired a shot.

61.     One of the brothers yelled, "I can't hear!" As Officer Dohan started to reply, the brother interrupted, "No seriously! I can't hear you! If they back off then I would be able to hear you." Rather than defuse a tense situation, the tactics employed by the Officers, and their Supervisors, inflamed the situation and resulted in chaos and led ultimately to the needless killings of both George and Emmett.

62.     Officer Ham and Officer Juarez arrived on the scene and positioned themselves in the alley behind the house. Officer Juarez was holding his AR-15 long gun and pointing it towards the house. Like Officer Dohan and Officer Fitzgerald, Officer Ham and Officer Juarez failed to find a suitable protective cover. Instead, they stood just behind the chain-link fence, which offered no cover whatsoever.

**The Senseless and Unjustified Shooting of Emmett Cocreham.**

63.     Officer Juarez then climbed onto the hood of a police SUV, and again aimed his long gun toward the house. This needlessly exposed Officer Juarez, and it ratcheted up the intensity of the situation.

64.     Emmett, standing in the backyard, made a 360 degree turn with his hands up and empty. Moments later, George opened the back door of the house, leaned out, and called to Emmett. Emmett, unarmed, took a few steps toward the door. He posed no threat to anyone and uttered no threats to anyone.

65.     At 9:05 p.m., without issuing any warning that the use of deadly force was imminent, Officer Juarez aimed at Emmett and fired four shots in rapid succession. One of Officer Juarez's bullets hit Emmett in the neck and another in the cranium. The shot in the brain killed Emmett instantly, and Emmett's lifeless body fell to the ground.

66.     The shots that struck and killed Emmett were not ricochets, stray shots, or accidents. Though Officer Juarez later claimed that he was aiming at George's center

mass, the evidence contradicts this story. He aimed at Emmett, and he shot and killed Emmett, with no justification or immunity. Officer Juarez' poor and reckless judgment caused him to act unreasonably and with undue haste.

67. What's more, Officer Juarez created a dangerous situation by exposing himself and by failing to take effective cover.

68. Officer Juarez described the man he shot to investigating Officers in the following statements, "I was focused on the one with a gun, the brother with the white shirt on." George was wearing blue and Emmett, the unarmed brother, was wearing white and gray. Emmett had no gun, and had never been seen with a gun, as is patently clear from the videos and the evidence. Juarez continued, "I could not let him shoot an officer, he was pointing the gun at officers." That statement also is false.

69. When Officer Juarez was asked about his knowledge of the call prior to arrival, he said he did not read the notes or learn of the details of the call, because he was focused on his partner's driving on the way to the Cocreham residence.

70. Officer Juarez was on site for a total of seven minutes before he shot and killed Emmett, including his arrival in the front yard, communication with Officers who told him to go to the back yard for coverage, driving to the back yard, getting out of police SUV, asking Officers who had been at the residence assessing the situation to move out of his way, jumping on the police SUV, and firing his weapon at Emmett, an unarmed man, and killing him instantly.

71. All of Officer Juarez's actions were needless and senseless. He was not properly and effectively directed by the Supervising Officer(s). What's more, he did not evaluate the situation as he should have. And further, his statements indicate he did not even know whom he was pointing his gun at before shooting an unarmed and non-combative man.

72.    When Detective Rudd interviewed Officer Juarez five hours after the shootings, Officer Juarez could not provide details regarding where the gun was pointed, how the gun was held, or where George and Emmett were located.  What's more, after admitting that he gave no verbal commands to anyone prior to killing Emmett, Officer Juarez remained silent when Detective Rudd asked why he didn't give any verbal commands.

73.    When Detective Rudd asked him how long he had to react, Officer Juarez again remained silent.  Detective Rudd then shamelessly utilized a leading question, which is completely inappropriate in the context of an internal shooting investigation, stating "did you have seconds?"

74.    At that point Officer Juarez agreed with and adopted the answer suggested by the leading question, indicating that he only had a second to respond because his fellow officers were in danger.  Detective Rudd clearly coached Officer Juarez before the investigation, and the coaching was evidenced by Juarez's lack of knowledge or details when interviewed by attorneys and other detectives.

75.    The nature of the shots suggests or indicates that Officer Juarez aimed at and shot Emmett intentionally and directly.  It leaves no other reasonable conclusion.

**The Senseless and Unjustified Shooting of George Cocreham.**

76.    Seeing his brother shot and killed, George immediately dropped or lowered himself towards the ground.  He then started to lift himself up to retreat back inside the house when Officer Dohan fired one shot and hit George in his right mid-back.

77.    The bullet tore through George's ribs and right lung and exited through his medial right upper chest.  The shot did not tear or sever any major arteries or veins.  The shot appears to have knocked George back through the doorway into the house or he walked back into the house.

78.     No objective evidence in the form of videos or photographs shows George holding a gun when he was shot and his brother was killed.

79.     After George was shot, he started bleeding from his bullet wound.   There was a trail of blood throughout the residence and a large pool of blood where he lay outside waiting for help.

80.     Several Officers claimed that George was holding a rifle, and even that he had pointed it at some of their number.  A rifle was found in the kitchen after George and Emmett were shot and killed, but it had no blood on it or anywhere near it.

81.     George was right-handed, was shot in the middle of his right back with the bullet exiting his right chest, suffered a puncture of his right lung, and began to bleed immediately after being shot.  He could not have carried the same rifle to the kitchen without getting a single drop of blood on or near the rifle and without leaving a trail of blood to the rifle. In addition, because he was right-handed and shot on the right side with a puncture of the right lung, it is extremely unlikely that he could have carried the rifle into the house.

82.     Further, though there was allegedly a spent cartridge in the chamber of the rifle, there was no credible evidence that the rifle was fired.  A box of 30-30 caliber cartridges was allegedly found in the residence, but the box appeared to be full.

83.     What's more, the City of Phoenix refused to allow Ms. Cocreham to return to her home until 9:00 a.m. on October 21, 2020, and thus Phoenix Officers had complete control of the scene to conduct a thorough search for evidence.

84.     Despite their search, no projectile was ever found from the rifle and there is no evidence of a projectile ever striking a wall, ceiling, floor, or other structure at the Cocreham house.

**Additional Circumstances**

85. Officer Juarez said the man he shot was holding a long gun and sweeping the rifle at Officers and at Emmett. In contradictory terms, he also stated the man in the white shirt was sweeping his gun at Officers, he saw the barrel pointed towards him, he was in fear for his life and the lives of fellow Officers, and that is why he fired his weapon multiple times. To reiterate what was stated above, George Cocreham was wearing a blue shirt and Emmett, the unarmed brother, was wearing the white shirt.

86. Officer Juarez further stated that the other brother was not in the line of fire. The man he shot never had a weapon or anything that resembled a weapon in his hands. It is noteworthy that other Officers jumped on board with the deceptive story and repeated the same statements to investigating officers and attorneys. The supervising Officers can be heard coaching the Officers before the investigating officers arrived on the scene.

87. The Officers' failure to find suitable protective cover, coupled with the chaos created by multiple Officers shouting incoherent commands to Emmett and George amidst the drowning helicopter noise, created an unreasonably dangerous situation for Ms. Cocreham and her sons, and directly and proximately caused the damages she suffered and the wrongful deaths of her two sons and the damages suffered by them.

88. What's more, Officer Juarez's decision to use lethal force against an indisputably unarmed Emmett, who posed no threat or danger to anyone, and his failure to properly identify his intended target before using lethal force, directly and proximately caused the damages suffered by Ms. Cocreham and the wrongful death of Emmett and the damages he suffered.

89. Similarly, Officer Dohan's decision to use lethal force against George, who appears to have been unarmed at the time he was shot, and who was retreating into the safety of his house with his back turned to the Officers, directly and proximately caused the damages suffered by Ms. Cocreham and the wrongful death of George and the damages he suffered.

90.     The acts and omissions described above clearly establish that the City of Phoenix failed to adequately train the Officers, and each of them, for situations similar to this one, which are not uncommon, are foreseeable, recur from time-to-time, and confront similarly situated officers on a daily basis or nearly daily basis, and that such failures also directly and proximately caused or contributed to the harm that befell George, Emmett, and Lillian Cocreham.  Further, these acts and omissions conformed to the City's official policies, customs, and practices, which were inadequate to equip the Officers with the knowledge and training necessary to successfully resolve the situation they faced.  The City of Phoenix's failure to train the Officers, coupled with the City's official policies, customs, and practices amounted to a deliberate indifference to the rights of persons with whom the police officers come into contact, including Lillian, Emmett and George Cocreham.

**The Utter Indifference to whether George Cocreham Lived or Died, and Allowing Him to Bleed to Death without Timely Aid or Transport.**

91.     At approximately 9:10 p.m. - 9:15 p.m., the air unit announced over the radio that they believed someone was crawling out from under a structure.  Nonetheless, it does not appear that any action was taken for at least ten minutes.  George was responsive at this time and his life could have been saved had the Officers provided emergency aid and immediately got him to the hospital, which they had the immediate ability to do, had they had any interest in doing so.  The Phoenix Fire Department was called at 9:22 p.m. and arrived on site at 9:23 p.m.  At 9:24 p.m., approximately nineteen minutes after George had been shot and started bleeding out, Officer Fitzgerald stated, "Is someone saying 'Ow' over there? … Who's that- Who's that over there- laying down on the- on the side over there?"  Officer Dohan replied that it was "the suspect" and noted, "He's laying down, it looks like there's nothing in his hands." Officer Dohan then called

out, "Hey, sir, are you hit?" and then noted to the Officers that it looked like George was bleeding.

92.     Various Officers yelled instructions to George, telling him to keep his hands empty and "roll to the alley". George complied with the instructions as best he could, despite the shot to his back and lung that was killing him. These instructions continued for approximately five minutes. At 9:31 p.m., multiple Officers entered the backyard through the alley gate. The Officers walked up to George, who was laying on his back in a pool of blood, with nothing in his hands or anywhere near him, gasping for breath and bleeding to death. George was responsive at this time and his life could have been saved had the Officers provided emergency aid and immediately got him to the hospital, which they had the immediate ability to do, had they had any interest in doing so. Instead, Officer Dohan and an unknown Officer then dragged George to the alley. Neither they nor any other Officer on the scene provided emergency aid to George or took any steps to save his life, despite the fact that timely aid would have saved his life.

93.     Most inexplicably of all, at 9:38 p.m., Officer Gerald Happeny and an unidentified Officer shoved George into a police SUV, where he remained until he was retrieved by the Phoenix Fire Department rescue team at 9:46 p.m., 41 minutes after he was shot by Officer Dohan. Placing George upright inside the SUV with a bleeding chest wound was negligent and unreasonable and exacerbated his physical condition, contributing to his death. Again, no one provided emergency aid of any kind to George during this entire time, despite the fact that he was bleeding to death in the police SUV where the Officers had placed him, and despite the fact that the Officers knew that the shots killed Emmett, that no one other than Officers remained at the scene, that no one would have posed any threat of any kind to the Officers had they rendered timely aid to George, and despite the fact that the Phoenix Fire Department rescue team was waiting and had been available on site since 9:23 p.m.

94.     Though the Phoenix Fire Department rescue team was on site at 9:23 p.m. and Officers saw George bleeding to death on the ground with no weapon at 9:24 p.m., the Officers did not bring George to the waiting and available Phoenix Fire Department team until 9:46 p.m.  George was unarmed and dying for 22 minutes, within feet of help but no one made a move to save his life.  Instead, George was left to bleed to death.

95.     At 9:09 p.m., an unidentified Officer in the alley who appears to be a supervisor directed, "We'll get him medical attention when we can. He's not moving. We've got eyes on him...."  The Officer then stated, "We're in no rush to get that guy right now."   That sums up the callous indifference to whether George lived or died.

96.     The Officers in the back alley, including without limitation, Officers Dohan, Fitzgerald, Happeny, Ham, Juarez, Wood, Miner, Peelman, Dorfman, Burns, Smoke, and other unidentified Officers, and each of them, and also the Supervising Officers, had a duty to take reasonable steps to administer emergency aid or allow aid to be administered to George Cocreham to save his life after he was shot in the back by Officer Dohan, and yet did nothing for him and failed to intervene to induce or force other Officers to render aid, which would have saved George's life, thus violating George's rights under art. 2, sections 4, 8, and 15, of the Arizona Constitution, other Arizona law, the Fourth and Fourteenth Amendments to the United States Constitution, and 42 U.S.C. § 1983, 1985, and 1988.

97.     The Officers showed a complete indifference as to whether George lived or died.  Under the facts and circumstances of this case, such conduct could only be deemed as extreme and outrageous and intentional or in reckless disregard for the safety and welfare of George.  What's more, the facts and circumstances leading up to the Officers' refusal to provide George with emergency aid, which resulted in his needless death, are compelling evidence that such Officers conspired and agreed to allow him to die to

eliminate the only other witness to the illegal and unconstitutional conduct perpetrated by the Officers on the night of October 20, 2020.

98.    George arrived at Valleywise Health Medical Center Trauma at 9:51 p.m. and was pronounced dead seven minutes later.  These facts indicate that George died from blood loss and could have been saved by the Officers had they provided even minimal emergency aid to stop the bleeding and/or immediately transported him to receive medical care, which they did not do.

99.    Meanwhile, the Officers inexplicably dragged Emmett's body from the location where he fell dead on the back patio to the alley, where his lifeless body was laid in the dirt and debris, and where residents keep their trash cans for weekly pick up.  Emmett was left in the alley for eight hours before the City of Phoenix called the coroner at 3:47 a.m.  Emmett's body was not picked up and taken to the Medical Examiner's Office until 5:36 a.m.  Such conduct, under the circumstances of this case, made no sense and indicates a conspiracy and cover-up.  Emmett's body should have been left where it fell when he was shot by Officer Juarez until a full and fair investigation into the officer-involved-shooting could take place.  Once the investigation was complete, the coroner should have been called promptly to retrieve Emmett's body.

**The Lack of Justification or Immunity.**

100.    No justification existed under the common law or under Title 13, Ch. 4, Ariz.Rev.Stat., and no immunity existed under Arizona law or federal law, for Officer Juarez to aim at and shoot Emmett in the head and neck and kill him while he was unarmed and posing no threat to himself or to anyone else.  Under the circumstances of this case, no reasonable person would have believed that physical force was immediately necessary to protect himself or anyone else against Emmett Cocreham, because he never threatened or attempted the use of any force, much less unlawful physical force, nor could he have done so.  To wit:

101.    Emmett was unarmed and threatening no one at the time and place described herein.  Yet, Officer Adrian Juarez shot him twice, once in the neck and once in the head, as Emmett walked with his empty hands towards the patio door leading into the kitchen.  Emmett's apparent last words were spoken to the Officers located in the back alley; he said, "I can't hear you. If you tell them [helicopter officers] to go away, I could hear you. I can't hear what you're saying".  Officer Juarez's shots killed Emmett instantly.

102.    No justification existed under the common law or under Title 13, Ch. 4, Ariz.Rev.Stat., and no immunity existed under Arizona law or federal law, for Officer Dohan to shoot George in the back.  Contrary to claims made by Officers, and claims circulated to the press, George was unarmed and threatening no one at the time and place described herein.  Seconds after Officer Juarez shot and killed Emmett, Officer Laker Dohan shot George in the back as George attempted to retreat into his house.  His hands were empty.  George was last heard telling his brother, Emmett, "Come on, let's [get?] the f. . . out of here. Come on Emmett!"  George and Emmett were not fighting or combative, they were scared and yelling, because they could not hear anyone over the sounds of the helicopter and many shouting Officers.

103.    After he was shot, and after the Officers at the back gate observed him with nothing in his hands, and after he did his best to comply with the Officers' demands that he roll towards them, and despite knowing that there were no other individuals in the house that could have caused them harm, the Officers rendered no aid to George – not even to put pressure on the wound to slow or stop the bleeding – and did nothing more than drag him to a police SUV and shove him inside, where he lost a substantial amount of blood, in total disregard of his safety and well-being.  The City of Phoenix officers are supplied with Quick Clot, and have it available to them in their vehicles.  Yet, they refused

to render emergency aid to George, and used none of the resources readily available to them to save George's life.

104.     This loss of control of the situation and ensuing chaos, unjustified shooting in the back, and then failure to render even minimal emergency aid after shooting him, killed George.  In a legal sense, the lack of training of the Officers, which amounts to a policy and practice at the City of Phoenix Police Department, and failure to render timely aid and transport after the shooting were the direct and proximate cause of George's death.

105.     The Medical Examiner concluded that George died of "complications from a gunshot wound."  His death could have been prevented if the City of Phoenix Officers would have rendered timely emergency aid, assisted in stopping the bleeding, and allowed Phoenix Fire to immediately provide emergency aid at the scene and transport him to the hospital in a timely manner.  Instead, they stood by watching George crawl and roll for help, as Officers continued to shout at him.  For at least 40 minutes, none of the Officers helped George medically or allowed emergency aid to be provided to him by Phoenix Fire Department personnel.  He was shot in the back and he was bleeding profusely, the City of Phoenix Officers callously and in an indecent, inhumane, and depraved manner let him bleed to death in their very presence.  In fact, Officer Fitzgerald was heard asking, "Is someone saying 'Ow?'," then various Officers instructed George to roll or crawl towards the back gate in the alley for medical assistance.  George had been bleeding for nearly 30 minutes without aid at that time.

106.     George was on the patio when Officers gave him commands to roll towards the gate. Ten minutes later, George was still on the patio and despite his best efforts, he was too weak to roll or crawl to the Officers for medical treatment.  Officers noted that both of his hands were empty and reported the same to their superiors, who said "just have him crawl to us for help."  Eventually, the Officers entered the back yard and

extracted George, where they left him in the alley in critical condition, still not rendering aid. Inexplicably, the Officers put George in a City of Phoenix Tahoe and transported him to the front of the Cocreham home, where the Phoenix Fire Department was waiting to render care.

107. George was in the care of the Phoenix Fire Department for five minutes, and within that time he apparently died. The Officers at the scene could have stopped George's bleeding and saved his life with appropriate emergency aid and by transporting him to the hospital. Instead, they did nothing, watching him bleed to death. Such callous indifference shocks the conscience, betrays the values of decent society, and draws the City of Phoenix into shame and disgrace.

**Integral Participation and Alternative Actions**.

108. Officers Ham, Fitzgerald, Dohan, Wood, Hawkins, and the other Officers in the alley saw Officer Juarez climb on top of the police SUV, without cover, and fire toward the house. In fact, Officer Juarez asked Officer Ham to move aside when he was on top of the vehicle. Officer Ham and other Officers in the immediate vicinity, as well as the Supervising Officers, had a reasonable opportunity to stop Officer Juarez; yet, they chose not to act and failed to stop him, thus directly causing or contributing to the harm, damages, and deaths suffered by Emmett and George. Ms. Cocreham currently lacks sufficient information to specifically identify the other Officers referenced above by name and, therefore, will amend the amended complaint when such information is discovered.

109. Similarly, Officers Fitzgerald, Ham, Juarez, Wood, Hawkins and other Officers in the immediate vicinity, as well as the Supervising Officers, observed Officer Dohan standing behind the chain-link fence in the alley without cover aiming his AR-15 at George Cocreham and had a reasonable opportunity to stop Officer Dohan from shooting George Cocreham; yet they chose not to act and failed to stop him, thus directly causing or contributing to the harm, damages, and deaths suffered by Emmett and George

Cocreham. Ms. Cocreham currently lacks sufficient information to specifically identify additional officers by name and, therefore, will amend the amended complaint when such information is discovered.

110. What's more, the Supervising Officers had a reasonable opportunity to direct the Officers in the back alley, including Officers Juarez and Dohan, among other things, to take safe cover, remain silent, control the perimeter, exercise patience and wait out the disturbance, and take no action(s) that would needlessly escalate the domestic disturbance into an unnecessarily dangerous situation and to the two deaths; yet they chose not to act and failed to act to stop the Officers, including Officer Juarez from shooting and killing Emmet, and Officer Dohan from shooting George in the back, thus directly causing and contributing to the harm, damages, and deaths suffered by Emmett and George Cocreham. These acts and omissions by the Officers and Supervising Officers were a direct and proximate cause of the harm and damages that befell George, Emmett and also Lillian Cocreham and were a violation of their rights under the Arizona Constitution and Arizona law, as well as their individual constitutional rights under the Fourth and Fourteenth Amendments to the United States Constitution.

111. The Supervising Officers and the other Officers that observed George after he was shot in the back and before he was finally transported to the hospital, including Lieutenant Eric Miner, Officers Wood, Dohan, Fitzgerald, Happeny, Juarez, Peelman, Dorfman, Burns, Smoke, Ham, and the tactical team that encountered George bleeding in the back yard, had a reasonable opportunity to stop all of the other similarly situated Officers from failing to render emergency aid to George or taking the necessary steps to allow George to be transported to the hospital, which would have saved his life, yet they chose not to act and failed to stop such Officers from allowing George to die, thus directly causing or contributing to George's death. Ms. Cocreham currently lacks sufficient

information to identify any additional officers by name and, therefore, will amend the amended complaint when such information is discovered.

**Violations of the City of Phoenix Use of Force Policy.**

112.    Phoenix Police Department Operations Order 1.5 sets forth the Department's Use of Force Policy. The General Policy stated in section 3 permits the use of force, but only under specified circumstances. In this case, the Supervisors and Officers violated the policy in numerous respects.

113.    First, the policy permits the use of only a "reasonable amount of force to conduct lawful safety activities." Reasonableness is judged on the totality of circumstances. Section 4(I) governs the use of deadly force. Five bullet points from this section of the policy are relevant to the analysis.

- The use of deadly force must be reasonable to protect the Officers or a third person "from another's use or threatened use of deadly force," or to overcome an attack "the employee reasonably believes would produce serious physical injury or death to the employee or another person."

- When "the circumstances justifying the use of deadly force no longer exist, deadly force will be immediately discontinued through the use of de-escalation strategies."

- "Deadly force is utilized as a last resort when other measures are not practical under the existing circumstances."

- "When the shooting of a subject appears imminent, employees will, if practical issue a verbal warning."

- "Firearms will not be used under circumstances in which a substantial and unjustifiable risk of injury or death to bystanders exists."

114.    Second, section 3(B)(2) of the Policy adduces the following non-exclusive circumstances bearing on reasonableness (bullet points in the original):

- "The severity of the crime."

- "Whether the subject poses an immediate threat to the safety of officers or others."

- "Whether the subject is actively resisting arrest or attempting to evade arrest by flight."

115.    Third, section 3(B)(3) of the Policy amplifies the test of reasonableness as follows:

    3)    "<u>Elements of Force</u> - Employees need to consider the following:

        a)    <u>Ability</u> – Does the subject have the apparent physical means to cause harm?

- Employees must also evaluate his/her ability to handle the threat passed by the subject.

        b)    <u>Opportunity</u> – The circumstances are such that the subject has the apparent ability to harm the employee/s or others.

- Distances, barriers, and opportunities for both the subject/s and employee/s should be taken into account.

        c)    <u>Jeopardy</u> – Is the subject causing an imminent and immediate threat to the employee/s or others?

- Denotes actions, cues, or indicators demonstrated by the subject.

        d)    <u>Preclusion</u> – All other alternatives have been reasonably considered and cannot be employed in a safe manner based on the totality of the circumstances the employee/s or others are facing."

116.   Fourth, Section 1(B) of the Policy states a duty to intervene: "Duty to Intervene – All employees **will** intervene when they know or should know another employee is using unreasonable force."  (Emphasis in original.)

117.   Fifth, Section 3(C) of the Policy requires officers at a shooting to render and summon aid:

> C.   <u>Medical Treatment</u>   - Employees are responsible for requesting medical treatment for subjects against whom force was used.
>
> •   Any time there is an injury, or an alleged injury, as a result of force used by Department personnel, **<u>employees will:</u>**
>
> •   Examine any person claiming injury and render first aid, if necessary.
>
> •   Request paramedics to respond to the scene, if appropriate.
>
> •   Immediately notify a supervisor. (Emphasis in original.)

118.   Sixth, Section 1(B) of the Policy imposes a reporting duty when unreasonable force is used: "All employees will immediately report excessive force verbally to a supervisor."

119.   The shootings and killings of Emmett Cocreham and George Cocreham violated the foregoing parts of the Use of Force Policy.

120.   In compliance with the Policy, the Supervisors should have de-escalated the situation.  Ms. Cocreham had left the scene, which removed her from any jeopardy.

121.   That left only Emmett and George at the scene – in the back of the house or in the back yard.  Accordingly, the Supervisors and Officers could have and should have sealed off the house and yard, established a barricade in the alley or in the back yard, for their defense and protection, and waited out the heat and emotions of the moment, until calm could have been restored.

122.   Instead of taking this reasonable course, which would have exposed no one to an unreasonable risk or danger, much less loss of life, the Supervisors lost control of

the scene and Officers Juarez and Dohan respectively shot and killed Emmett and George with no cause or justifications. To wit:

123.    It was manifestly unreasonable for Officer Juarez to shoot and kill Emmett. At all times, Emmett was unarmed, he had committed no crime, he was not attempting to flee or evade arrest, and he was posing no threat to anyone – not to himself and not to anyone else.  Officer Juarez escalated the intensity of the situation.  What's more, it was not an accident for Officer Juarez to shoot and kill Emmett.  The process of drawing down the rifle, aiming it at Emmett, sighting him in the red-dot sight, and firing and hitting him twice, once at the head and once at the neck, negates any claim of accident.

124.    It was likewise manifestly unreasonable for Officer Dohan to shoot George in the back.  The evidence does not show that he was armed when he was shot.  He was retreating into the house, and thus posed no immediate threat to himself or anyone else. He was not attempting to flee and was not in the process of committing a crime.

125.    Officer Ham, Fitzgerald, Ham, Duhan, Wood, Hawkins and potentially other Officers were situated next to Officer Juarez, saw him draw down on Emmett and shoot and kill Emmett.  They saw what he was doing, they could have tried to get him off the SUV hood, and they could have tried to stop Officer Juarez.  Officer Fitzgerald and potentially other Officers were situated next to Officer Dohan.  Policy 1(B) required all of these Officers to intervene.  They all failed to do so. Ms. Cocreham currently lacks sufficiently lacks information to specifically identify additional officers by name and, therefore will amend the amended complaint when such information is discovered

126.    Most unreasonable of all were the failure timely to render aid to George after Officer Dohan shot him in the back and the failure to transport him to one of the three Level 1 trauma centers no more than four miles and ten minutes distant from the scene.  These failures clearly violated section 3(C) of the Policy, as well as all norms of human decency.

**The Cover-Up.**

127.    The City of Phoenix, the Phoenix Police Department, and the Officers attempted a cover up.  In the Incident Report, a number of Officers reported that George shot Emmett.  On the night of October 20, 2020, or in the early morning of October 21, 2020, Officer Rudd told Ms. Cocreham that Emmett shot George.  Yet, no evidence ever existed that George shot Emmett, or that Emmett shot George.  Officer Juarez shot Emmett, and Officer Dohan shot George.  The Officers claimed that George was armed and fired a shot but, as mentioned above, no body camera footage has been produced showing George with a weapon in the moments before he and Emmett were shot, and the lack of blood on or around the rifle where it was found in the kitchen proves that George was unarmed when he was shot.  Ms. Cocreham currently lacks sufficient information to identify such officers by name and, therefore, will amend the amended complaint when such information is discovered.

128.    There is no credible evidence to establish that George ever fired the rifle during the incident.  No projectile was found.  No damage was done to any walls, buildings, or structures.  A casing was found in the rifle, but that does not mean the rifle was fired during this incident.  It is just as logical that it was fired earlier and remained in the rifle.

129.    The City of Phoenix also misled the public in its video released on YouTube, incorrectly stating that George pointed a rifle at Emmett and the Officers in the alley and that George fired a round from his rifle.

130.    Ms. Cocreham found the word "fuck" written in chalk on the exterior wall of her house in the same oil-based chalk that was used by the City of Phoenix to mark the bullet holes left by the Officers.

131.    Detective Michael Rudd had informed Mr. Martinez about George and Emmett's passing.  Detective Rudd told Ms. Cocreham that one brother shot the other

brother and they (the City of Phoenix) had to shoot the brother with the gun. Ms. Cocreham began to cry and asked, "How did this happen?" Detective Rudd replied, "Mom, we had to protect the officers." However, this was not the truth. George did not shoot Emmett, Officer Juarez did. Emmett did not shoot George, Officer Dohan did. What's more, neither George nor Emmett ever placed any of the Officers or anyone else in any kind of physical or personal jeopardy.

132. In addition to the conduct described above, the City of Phoenix has refused to turn over critical evidence, including video footage and imaging from the Phoenix Police helicopter that was flying overhead during the relevant time period, to Ms. Cocreham related to this horrific shooting pursuant to a lawful, despite her repeated public records requests pursuant to A.R.S. § 39-121 *et seq.* Such conduct, coupled with the conduct described above, is extreme and outrageous, and shows a reckless disregard that such conduct would, and indeed has caused, extreme and severe emotional distress on Ms. Cocreham as the mother and sole wrongful death beneficiary of George and Emmett Cocreham.

**Ms. Cocreham's Loss of Companionship and Consortium and Related Losses.**

133. The conduct described above deprived Ms. Cocreham of the companionship, consortium, and society of her only two children, and caused her to suffer severe mental and emotional distress, depression, anxiety, insomnia, panic attacks, anorexia nervosa, for which she is receiving medical care, all without due process of law.

134. What's more, all such conduct demonstrates a reckless and callous indifference to constitutional rights of Emmett, George, and Ms. Cocreham.

**The Failure to Treat Emmett's Body with Dignity and Decency.**

135. With no reason to do so, the Officers moved Emmett's body from the back yard, where he was shot and killed, to the alley behind the Cocreham home, where it lay until the next day, October 21, 2020. Common decency, and certainly societal norms,

would have called for his body to be moved promptly from the alley behind the Cocreham home to the Maricopa County Medical Examiner's facilities, or at least kept in the Cocreham home, instead of in a trashy alley.

136. Yet Phoenix Officers placed it in the alley and let it remain in the alley for many hours. The thought of Emmett's body lying undignified in the alley torments Ms. Cocreham and has caused her to suffer enormous mortification, mental pain, anxiety, depression, and anguish, for which Phoenix and the Supervisors and Officers are responsible.

**FIRST CLAIM FOR RELIEF**

**Wrongful Death of Emmett**

137. Ms. Cocreham adopts herein by reference all allegations of all preceding paragraphs.

138. For the reasons stated in the paragraphs above, the Defendants, and each of them, are liable to Ms. Cocreham under Arizona's wrongful death laws, A.R.S. §§ 12-611 through 12-613.

139. Such conduct proximately caused Ms. Cocreham to suffer damages from the wrongful death of her son for which the Defendants, and each of them, are liable to Ms. Cocreham under Arizona's wrongful death laws, A.R.S. §§ 12-611 through 12-613.

140. Included in such conduct, without limitation, Officer Juarez wrongfully shot and killed Emmett with no justification or immunity.

141. Officer Juarez's killing of Emmett proximately caused Ms. Cocreham to suffer damages from the wrongful death of her son for which Officer Juarez is liable to Ms. Cocreham under Arizona's wrongful death laws, A.R.S. §§12-611 through 12-613.

142. The Officers other than Officer Juarez and the City of Phoenix further contributed or added to the efficient cause of Emmett's wrongful death as follows:

143.     In addition to Officer Juarez's conduct, the Supervising Officers, including without limitation, Officers Bull #9010, Wood #9097, Miner #7273, Kipper #8151, and Mills #8093, failed to gain command and control of the scene.

144.     In addition, the training policies of Defendant City of Phoenix and Chief Williams were not adequate to train the Officers to handle the usual and recurring situations with which they must deal, including the situations and events on the night of October 20, 2020.

145.     Officer Juarez's killing of Emmett, the failure of the Supervising Officers to gain control and command of the scene, and the failure of the City of Phoenix and Chief Williams to train its officers proximately caused the wrongful death of Emmett and proximately caused Ms. Cocreham to suffer damages from the wrongful death of her son for which Officer Juarez, the City of Phoenix, and all other Officers are liable to Ms. Cocreham under A.R.S. §§ 12-611 through 12-613.  Under A.R.S. §§ 12-611 through 12-613, the City of Phoenix is equally liable to Ms. Cocreham for such damages same under the doctrines of agency, *respondeat superior*, and master/servant.

146.     Such damages exceed the jurisdictional threshold of this Court and are to be determined by the jury under A.R.S. § 12-613 as the jury deems fair and just with reference to the injury resulting from Emmett's death to Ms. Cocreham, "and also having regard to the mitigating or aggravating circumstances attending the wrongful act, neglect or default."

147.     Such damages include Ms. Cocreham's loss of Emmett's consortium, love, affection, companionship, care, protection, and guidance since his death and in the future. In addition, Ms. Cocreham has suffered pain, grief, sorrow, anguish, stress, shock, mental suffering, depression, insomnia, anxiety, social isolation, panic attacks, and anorexia nervosa resulting from Emmett's killing, which damages she will continue to suffer in the future, as well the reasonable expenses of funeral and burial.

148.     Ms. Cocreham therefore is entitled to judgment against Officer Juarez and Jane Doe Juarez and their marital community, against all other Officers and their respective spouses and marital communities, and against the City of Phoenix for all such damages.

## SECOND CLAIM FOR RELIEF

### Wrongful Death of George

149.     Ms. Cocreham adopts herein by reference all allegations of all preceding paragraphs.

150.   For the reasons stated in the paragraphs above, the Defendants, and each of them, are liable to Ms. Cocreham under Arizona's wrongful death laws, A.R.S. §§ 12-611 through 12-613.

151.   Such conduct proximately caused Ms. Cocreham to suffer damages from the wrongful death of her son for which the Defendants, and each of them, are liable to Ms. Cocreham under Arizona's wrongful death laws, A.R.S. §§ 12-611 through 12-613.

152.     Included in such conduct, without limitation, Officer Dohan wrongfully shot and killed George with no justification or immunity.

153.     All of the Officers on scene had a duty to render meaningful aid to George after Officer Dohan shot him, including the immediate transport of George to hospital.

154.     All Officers breached such duty by failing to render timely and adequate aid to George, which would have saved his life.

155.     Officer Dohan's shooting of George and the failure of all Officers to render timely and adequate aid proximately caused Ms. Cocreham to suffer damages from the wrongful death of her son for which Officer Dohan and all other Officers are liable to Ms. Cocreham under Arizona's wrongful death laws, A.R.S. §§12-611 through 12-613.

156.     The Officers other than Officer Dohan and the City of Phoenix further contributed or added to the efficient cause of Emmett's wrongful death as follows:

157.    They failed to render timely and proper aid to George as he lay bleeding to death before them, and such aid would have saved his life.

158.    Further, the Supervising Officers, including without limitation, Officers Bull #9010, Wood #9097, Miner #7273, Kipper #8151, and Mills #8093, failed to gain command and control of the scene.

159.    In addition, the training policies of Defendant City of Phoenix and Chief Williams were not adequate to train its officers to handle the usual and recurring situations with which they must deal, including the situations and events on the night of October 20, 2020.

160.    Officer Dohan's killing of George, the failure of all Officers to render timely and adequate aid to George, the failure of the Supervising Officers to achieve command and control of the scene, the failure of the City of Phoenix and Chief Williams to properly train its officers for situations like the ones that occurred on the night of October 20, 2020, proximately caused the wrongful death of George and proximately caused Ms. Cocreham to suffer damages from the wrongful death of her son for which Officer Dohan, the City of Phoenix, and all other Officers are liable to Ms. Cocreham under A.R.S. §§ 12-611 through 12-613.

161.    The City of Phoenix is equally liable to Ms. Cocreham for such damages same under the doctrines of agency, *respondeat superior*, and master/servant.

162.    Such damages exceed the jurisdictional threshold of this Court and are to be determined by the jury under A.R.S. § 12-613 as the jury deems fair and just with reference to the injury resulting from George's death to Ms. Cocreham, "and also having regard to the mitigating or aggravating circumstances attending the wrongful act, neglect or default."

163.    Such damages include Ms. Cocreham's loss of George's consortium, love, affection, companionship, care, protection, and guidance since his death and in the future.

In addition, Ms. Cocreham has suffered pain, grief, sorrow, anguish, stress, shock, mental suffering, depression, insomnia, anxiety, social isolation, panic attacks, and anorexia nervosa resulting from George's killing, which damages she will continue to suffer in the future, as well the reasonable expenses of funeral and burial.

164.    Ms. Cocreham therefore is entitled to judgment against Officer Dohan and Jane Doe Dohan and their marital community, against all other Officers and their respective spouses and marital communities, and against the City of Phoenix for all such damages.

### THIRD CLAIM FOR RELIEF

### Property Damage

165.    Ms. Cocreham adopts herein by reference all allegations of all preceding paragraphs.

166.    All Officers owed Ms. Cocreham a duty to use reasonable care in coming onto her property at 2210 E. Amelia Avenue, Phoenix, Arizona.

167.    In breach of such duties, the shots fired by Officers Juarez and Dohan or the Officers' subsequent crime scene investigation or both proximately caused damages to Ms. Cocreham's property for which the City is liable to Ms. Cocreham.

168.    Ms. Cocreham therefore is entitled to judgment against the Officers and the City of Phoenix for all such property damages in an amount to be determined at trial.

### FOURTH CLAIM FOR RELIEF

### Public Records – A.R.S. §39-121.01

169.    Ms. Cocreham adopts herein by reference all allegations of all preceding paragraphs.

170.    By means of letters dated January 13, 2021 and January 20, 2021, copies of which are attached as Exhibit 1 to this amended complaint and are adopted into this claim

by reference, and acting through counsel D. Aaron Brown, Ms. Cocreham made a request, pursuant to A.R.S. § 39-121.01, for copies of public records from the City of Phoenix.

171.    The City of Phoenix acknowledged the request by means of various emails dated from February 10-May 5, 2021, received from the City of Phoenix Police Records Administrator, City of Phoenix, a copy of which is attached as Exhibit 2 to this amended complaint and is adopted into this claim by reference.

172.    Not having received some of the requested documents from the City of Phoenix, D. Aaron Brown, on behalf of Lily Cocreham, followed up the requests by means of a letter, a copy of which is attached, together with its enclosure, as Exhibit 3 to this amended complaint and is adopted into this claim by reference.

173.    The February 23, 2021 letter reiterated the respective requests for public documents, and put the City of Phoenix on notice that action to compel production would be taken, as provided in A.R.S. § 39-121.02, if the documents were not produced promptly.

174.    To date, the City of Phoenix has failed to produce several of the documents in response to Ms. Cocreham's requests, despite their obligation to do so promptly under A.R.S. § 39-121.01.

175.    More recently, David Cantelme, on Ms. Cocreham' behalf re-requested the previous document requests of un-redacted versions of Phoenix Police body cams, incident site photographs and Police helicopter video along with call records to the Phoenix City Attorney Chris Meyers on June 1, 2021 and June 14, 2021 herein as Exhibit 4.

176.    The City's inaction and failure to produce such records promptly, is deemed improper and unlawful denials of Ms. Cocreham's public-records requests under A.R.S. § 39-121.01(E), and accordingly it has failed "to perform a duty required by law as to which [they have] no discretion," within the meaning of Rule 3; Special Action Rules.

177.    Ms. Cocreham is entitled to and claims an award of reasonable attorneys' fees and costs incurred in this action against the City of Phoenix as provided by A.R.S. § 39-121.02(B).

178.    As a result, Ms. Cocreham is entitled to judgment pursuant to A.R.S. § 39-121.02(A) ordering the City of Phoenix forthwith to produce the public records requested by Ms. Cocreham, as described in this claim, and awarding her reasonable attorneys' fees and costs incurred in this action pursuant to A.R.S. § 39-121.02(B).

### FIFTH CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – Emmett's Death

179.    Ms. Cocreham adopts herein by reference all allegations of all preceding paragraphs.

180.    At all times material to this action, all Officers acted under the color of Arizona law.

181.    By shooting and killing Emmett without justification, Officer Juarez violated Ms. Cocreham's rights under the Fourth and Fourteenth Amendments to the United States Constitution by the deprivation of companionship and consortium, and the loss of society and association with her son Emmett without due process of the law.

182.    Such violation and deprivation of Ms. Cocreham's rights under the Fourth and Fourteenth Amendments proximately caused her to suffer damages in the form of the loss of Emmett's consortium, love, affection, companionship, care, protection, and guidance since his death and in the future.  In addition, Ms. Cocreham has suffered pain, grief, sorrow, anguish, stress, shock, mental suffering, depression, insomnia, anxiety, social isolation, panic attacks, and anorexia nervosa resulting from Emmett's killing, which damages she will continue to suffer in the future, as well the reasonable expenses of funeral and burial.

183.     Officer Juarez therefore is liable to Ms. Cocreham for all such damages under 42 U.S.C. § 1983.

184.     Defendant City of Phoenix failed to provide Officer Juarez and the other Defendants with adequate training to appropriately deal with the events of October 20, 2020, which events are usual and recurring events for law enforcement in the City of Phoenix.  Such failures to train amounted to a deliberate indifference to the rights of Emmett Cocreham and also his mother, Ms. Cocreham, and proximately caused the damages that befell Ms. Cocreham.

185.     Under the doctrine of supervisory liability, Officers Bull #9010, Wood #9097, Miner #7273, Kipper #8151, Mills #8093, and possibly other Officers are therefore equally liable for such damages to Ms. Cocreham under 42 U.S.C. § 1983.

186.     Officers Bull #9010, Wood #9097, Miner #7273, Kipper #8151, Mills #8093, and possibly other Officers personally participated in the above-mentioned deprivation of constitutional rights of Emmett Cocreham and Ms. Cocreham.

187.     Officers Bull #9010, Wood #9097, Miner #7273, Kipper #8151, Mills #8093, and possibly other Officers knew of the violations and failed to act to prevent them.

188.     Under the doctrine of bystander liability/integral participation, Officers Bull #9010, Wood #9097, Miner #7273, Kipper #8151, Mills #8093, and possibly other Officers are therefore equally liable for such damages to Ms. Cocreham under 42 U.S.C. § 1983.

189.     Officers Bull #9010, Wood #9097, Miner #7273, Kipper #8151, Mills #8093, and possibly other Officers set in motion of acts which caused others to inflict constitutional injury upon Emmett and Ms. Cocreham.

1    190.    Defendants, each of them, with authority to do so, promulgated or

2    implemented a policy so deficient that the policy itself is a repudiation of constitutional

3    rights' and is the moving force of the constitutional violation.

4    191.    The death of Emmett, and Ms. Cocreham's damages claimed herein, are a

5    direct and proximate result of the above-mentioned failures and breaches.

6    192.    Ms. Cocreham has suffered and will continue to suffer injury and damage

7    as a result of these Defendants' breaches, acts and omissions.

8    193.    Under the doctrine of Bystander Liability/Integral Participation, all Officers

9    are equally liable to Ms. Cocreham for all such damages under 42 U.S.C. § 1983.

10    194.    At all relevant times, all Officers owed members of the public, including

11    Ms. Cocreham and the decedents, a duty to intercede or intervene when their fellow

12    officers violate the constitutional rights of a suspect or other citizen, including the rights

13    of Emmett and Ms. Cocreham.

14    195.    At all relevant times, all Officers knew or should have known that a fellow

15    officer was violating the constitutional rights of Emmett and Ms. Cocreham.

16    196.    At all relevant times, all Officers had a reasonable opportunity to prevent

17    the harm by act or omission.

18    197.    At all relevant times, all Officers, and each of them, chose not to act.

19    198.    At all relevant times, all Officers, and each of them, breached their duty by

20    the above-mentioned actions and inactions to intercede or intervene when fellow officers

21    were violating the constitutional rights of Emmett and Ms. Cocreham.

22    199.    The death of Emmett, and Plaintiff's damages claimed herein, are a direct

23    and proximate result of the above-mentioned failures and breaches.

24    200.    Ms. Cocreham has suffered and will continue to suffer injury and damage

25    as a result of these Defendants' breaches, acts and omissions.

26

47

1    201.   Ms. Cocreham is entitled to an award of reasonable attorneys' fees under
2  42 U.S.C. § 1988(b) against the City of Phoenix, and against all Officers and their
3  respective spouses and marital communities.

4    202.   Ms. Cocreham therefore is entitled to judgment against Officer Juarez and
5  Jane Doe Juarez and their marital community, and against all other Officers and their
6  respective spouses and marital communities, and against the City of Phoenix, for all such
7  damages and for an award of reasonable attorneys' fees under 42 U.S.C. § 1988(b).

8                          **SIXTH CLAIM FOR RELIEF**
9                    **42 U.S.C. § 1983 – George's Death**

10   203.   Ms. Cocreham adopts herein by reference all allegations of all preceding
11  paragraphs.

12   204.   At all times material to this action, all Officers acted under the color of
13  Arizona law.

14   205.   By shooting and killing George, Officer Dohan violated Ms. Cocreham's
15  rights under the Fourth and Fourteenth Amendments to the United States Constitution by
16  the deprivation of companionship and the loss of society and association with her son
17  George without due process of the law.

18   206.   By failing to render timely and adequate aid to George, resulting in his loss
19  of life when timely and adequate aid could have saved his life, all Officers violated Ms.
20  Cocreham's rights under the Fourth and Fourteenth Amendments to the United States
21  Constitution by the deprivation of companionship and the loss of society and association
22  with her son George.

23   207.   Such violations and deprivations of Ms. Cocreham's rights under the Fourth
24  and Fourteenth Amendments proximately caused her to suffer damages in the form of the
25  loss of George's consortium, love, affection, companionship, care, protection, and
26  guidance since his death and in the future.  In addition, Ms. Cocreham has suffered pain,

grief, sorrow, anguish, stress, shock, mental suffering, depression, insomnia, anxiety, social isolation, panic attacks, and anorexia nervosa resulting from George's killing, which damages she will continue to suffer in the future, as well the reasonable expenses of funeral and burial.

208.    Officer Dohan and all other Officers are therefore is liable to Ms. Cocreham for all such damages under 42 U.S.C. § 1983.

209.    Defendant City of Phoenix failed to provide Officer Dohan and the other Officers with adequate training to appropriately deal with the events of October 20, 2020, which events are usual and recurring events for law enforcement in the City of Phoenix. Such failures to train amounted to a deliberate indifference to the rights of George and also his mother, Ms. Cocreham, and proximately caused the injures that occurred to Ms. Cocreham.

210.    Under the doctrine of supervisory liability, Officers Bull #9010, Wood #9097, Miner #7273, Kipper #8151, Mills #8093, and possibly other Officers are equally liable for such damages to Ms. Cocreham under 42 U.S.C. § 1983.

211.    Officers Bull #9010, Wood #9097, Miner #7273, Kipper #8151, Mills #8093, and possibly other Officers personally participated in the above-mentioned deprivation of constitutional rights of George Cocreham and Ms. Cocreham.

212.    Officers Bull #9010, Wood #9097, Miner #7273, Kipper #8151, Mills #8093, and possibly other Officers knew of the violations and failed to act to prevent them.

213.    Officers Bull #9010, Wood #9097, Miner #7273, Kipper #8151, Mills #8093, and possibly other Officers set in motion of acts which caused others to inflict constitutional injury upon George Cocreham and Ms. Cocreham.

214. All Officers, and each of them, with authority to do so, promulgated or implemented a policy so deficient that the policy itself is a repudiation of constitutional rights' and is the moving force of the constitutional violation.

215. The death of George, and Ms. Cocreham's damages claimed herein, are a direct and proximate result of the above-mentioned failures and breaches.

216. Ms. Cocreham has suffered and will continue to suffer injury and damage as a result of these Defendants' breaches, acts and omissions.

217. Under the doctrine of Bystander Liability/Integral Participation, all Officers are equally liable to Ms. Cocreham for all such damages under 42 U.S.C. § 1983.

218. At all relevant times, the Defendants owed members of the public, including Ms. Cocreham and her two decedents, a duty to intercede or intervene when their fellow officers violate the constitutional rights of a suspect or other citizen, including the rights of George and Ms. Cocreham.

219. At all relevant times, all Officers knew or should have known that a fellow officer was violating the constitutional rights of George Cocreham and Ms. Cocreham.

220. At all relevant times, Defendants had a reasonable opportunity to prevent the harm by act or omission.

221. At all relevant times, Defendants chose not to act.

222. At all relevant times, Defendants, and each of them, breached their duty by the above-mentioned actions and inactions to intercede or intervene when fellow officers were violating the constitutional rights of George Cocreham and Ms. Cocreham.

223. The death of George Cocreham, and Ms. Cocreham's damages claimed herein, are a direct and proximate result of the above-mentioned failures and breaches.

224. Ms. Cocreham has suffered and will continue to suffer injury and damage as a result of these Defendants' breaches, acts and omissions.

225. Ms. Cocreham is entitled to an award of reasonable attorneys' fees under 42 U.S.C. § 1988(b) against all the City of Phoenix, and against all Officers and their respective spouses and marital communities.

226. Ms. Cocreham therefore is entitled to judgment against Officer Dohan and Jane Doe Dohan and their marital community, against all other Officers and their respective spouses and marital communities, and against the City of Phoenix, for all such damages and for an award of reasonable attorneys' fees under 42 U.S.C. § 1988(b).

## SEVENTH CLAIM FOR RELIEF

### Punitive Damages

227. Ms. Cocreham adopts herein by reference all allegations of all preceding paragraphs.

228. All Officers' conduct in failing to render aid to George as he lay wounded and bleeding to death, when timely and reasonable aid could have saved his life, was extreme and outrageous as to go beyond all bounds of decency and qualifies to be regarded as atrocious and utterly intolerable in a civilized community and constitutes conduct wrought by an evil hand guided by an evil mind, as those terms are used within Arizona punitive-damages law.

229. All Officers' conduct was driven by evil motive or intent and it involved a reckless or callous indifference to the constitutional rights of George and Ms. Cocreham.

230. To such extent, all Officers acted outside the course and scope of their employment by the City of Phoenix and deprived them of the immunity otherwise afforded them by A.R.S. § 12-820.04.

231. All Officers are therefore liable to Ms. Cocreham for an award of punitive and exemplary damages under Arizona law and under 42 U.S.C. § 1983 in an amount to be proven at trial.

1    232.    Ms. Cocreham therefore is entitled to judgment against all Officers and

2    their respective spouses and marital communities for punitive and exemplary damages

3    under Arizona law and under 42 U.S.C. § 1983, all in an amount to be proven at trial.

4    233.    Ms. Cocreham is further entitled to judgment against all Officers and their

5    spouses and marital communities for reasonable attorneys' fees incurred in pursuing this

6    action under 42 U.S.C. § 1988(b).

7                            **DEMAND FOR JUDGMENT**

8    Ms. Cocreham accordingly respectfully demands that the Court grant her judgment

9    affording her the following relief:

10   A.    For the claims for relief pleaded under Arizona law, judgment against the

11   City of Phoenix and all Officers and their respective spouses and marital communities for

12   all damages proximately caused Ms. Cocreham as alleged herein, in an amount to be

13   proven at trial;

14   B.    For the claim pleaded under A.R.S. §39-121.01, judgment against the City

15   of Phoenix ordering it to forthwith produce the public records requested by Ms.

16   Cocreham, as described in this claim, and awarding her reasonable attorneys' fees and

17   costs incurred in this action pursuant to A.R.S. § 39-121.02(B).

18   C.    For the claims for relief pleaded under 42 U.S.C. § 1983, judgment against

19   the City of Phoenix and against all Officers and their respective spouses and marital

20   communities for damages proximately caused Ms. Cocreham as alleged herein, in an

21   amount to be proven at trial;

22   D.    Judgment against all Officers and their respective spouses and marital

23   communities for punitive and exemplary damages under Arizona law and under 42 U.S.C.

24   § 1983, all in an amount to be proven at trial;

25

26

E.    Judgment against the City of Phoenix and all Officers and their respective spouses and marital communities for reasonable attorneys' fees incurred in pursuing this action under 42 U.S.C. § 1988(b); and

F.    Judgment against all Defendants for all other relief as is just, proper, or equitable under the facts and circumstances of this action.

RESPECTFULLY SUBMITTED on September 23, 2021.

**CANTELME & BROWN, P.L.C.**

/s/ D. Aaron Brown, Bar No. 022133
2020 S. McClintock Drive, Suite 109
Tempe, Arizona 85282
*Attorneys for Plaintiff Lillian Cocreham*

EXHIBIT 1

CANTELME BROWN, LAWYERS

D. Aaron Brown
aaron@cb-attorneys.com

A PROFESSIONAL LIABILITY CORPORATION
2020 S. McClintock Drive, Suite 109
TEMPE, ARIZONA 85282

Direct (602) 200-0105
Main (602) 200-0104
Facsimile (602) 200-0106

January 13, 2021

Public Records and Services Unit
City of Phoenix
1717 E. Grant Street, Suite 100
Phoenix, Arizona 85034

Re: Lillian Cocreham/Public Records Request

Dear Public Records and Services Unit Representative:

My Law Firm and I represent Lillian Cocreham in connection with the shooting deaths of her two sons, George Cocreham and Emmett Cocreham, at the hands of City of Phoenix Police Officers, on October 20, 2020, at Ms. Cocreham's home, located at 2210 E. Amelia Avenue, Phoenix.

Please allow this correspondence to serve as a public records request to the City on behalf of Ms. Cocreham. Ms. Cocreham does not make this request for any commercial purpose, within the meaning of such term defined in A.R.S. § 39-121.

Pursuant to A.R.S. §§ 39-121 through 39-161, we seek and request, on Ms. Cocreham's behalf, any all documents related to George Cocreham (43 years old) and Emmett Cocreham (44 years old), generated from October 19, 2020, to present. This includes, but is not limited to:

> copies of any and all police reports, investigation reports, incident reports, supplemental reports, computer aided dispatch logs, 9-1-1 calls, all radio traffic, call logs, premise history, witness statements, photographs, images, videos, audio recording, Body Worn Camera (BWC), dash camera video and audio recordings, internal investigations and reports, administrative investigations and reports, third-party investigations and reports, and criminal investigations and reports, as well as emails, letters, voicemail recordings and messages between The City of Phoenix and Maricopa County Attorney's Office.

As you may know, Arizona law defines "public records" broadly and creates a presumption requiring the disclosure of public documents. *See Carlson v. Pima County,*



141 Ariz. 487, 489-90 (1984) ("We think that the objective implicitly expressed in § 39121.01 is to broadly define those records which are open to the public for inspection under § 39-121, thus obviating the need for any technical distinction between 'public records' or 'other matters,' insofar as the right to inspection by the public is concerned").

In that vein, A.R.S. § 39-121 affirms the presumption of openness, stating that public records and other matters in the custody of any officer shall be open to inspection by any person at all times during office hours. *See Griffis v. Pinal County*, 215 Ariz. 1, 4, ¶ 8 (2007) (A.R.S. § 39-121 "affirms the presumption of openness, stating that '[p]ublic records and other matters in the custody of any officer shall be open to inspection by any person at all times during office hours.'"

What's more, A.R.S. § 39-121.01(D)(1) requires the public agency to "promptly furnish" copies of records. Court have interpreted "prompt" under the statute to mean "quick to act or to do what is required" or "done, spoken, etc. at once or without delay." *See West Valley View, Inc. v. Maricopa County Sheriff's Office*, 216 Ariz. 225, 230, 1121 (App. 2007) ("Because the statute does not define 'promptly' we turn again to a dictionary, which defines 'prompt' to mean 'quick to act or to do what is required' or `done, spoken, etc. at once or without delay.")

Please contact undersigned directly if you need additional information or seek clarification of our requests

I appreciate your prompt attention to this matter.

Very truly yours,

**CANTELME & BROWN, P.L.C.**

D. Aaron Brown

cc.    Lillian Cocreham
       Cris Meyers, Esq., Phoenix City Attorney

# CANTELME  BROWN,  LAWYERS

D. Aaron Brown
aaron@cb-attorneys.com

A PROFESSIONAL LIABILITY CORPORATION
2020 S. McClintock Drive, Suite 109
TEMPE, ARIZONA 85282

Direct (602) 200-0105
Main (602) 200-0104
Facsimile (602) 200-0106

January 20, 2021

Public Records and Services Unit
City of Phoenix
1717 E. Grant Street, Suite 100
Phoenix, Arizona 85034

Re: Lillian Cocreham/Public Records Request

Dear Public Records and Services Unit Representative:

My Law Firm and I represent Lillian Cocreham in connection with the shooting deaths of her two sons, George Cocreham and Emmett Cocreham, at the hands of City of Phoenix Police Officers, on October 20, 2020, at Ms. Cocreham's home, located at 2210 E. Amelia Avenue, Phoenix.

Please allow this correspondence to serve as a public records request to the City on behalf of Ms. Cocreham. Ms. Cocreham does not make this request for any commercial purpose, within the meaning of such term defined in A.R.S. § 39-121.

Pursuant to A.R.S. §§ 39-121 through 39-161, we seek and request, on Ms. Cocreham's behalf, any all documents related to:

1.    Copies of any and all officer training manuals, protocols, videos, audios, or the like, in effect from January 1, 2020, to the present.

2.    Copies of all officer supervisor protocols for domestic violence incidents.

As you may know, Arizona law defines "public records" broadly and creates a presumption requiring the disclosure of public documents. *See Carlson v. Pima County,* 141 Ariz. 487, 489-90 (1984) ("We think that the objective implicitly expressed in § 39121.01 is to broadly define those records which are open to the public for inspection under § 39-121, thus obviating the need for any technical distinction between 'public records' or 'other matters,' insofar as the right to inspection by the public is concerned").

In that vein, A.R.S. § 39-121 affirms the presumption of openness, stating that public records and other matters in the custody of any officer shall be open to inspection by any person at all times during office hours. *See Griffis v. Pinal County,* 215 Ariz. 1, 4, ¶ 8 (2007)

(A.R.S. § 39-121 "affirms the presumption of openness, stating that `[p]ublic records and other matters in the custody of any officer shall be open to inspection by any person at all times during office hours.'"

What's more, A.R.S. § 39-121.01(D)(1) requires the public agency to "promptly furnish" copies of records. Court have interpreted "prompt" under the statute to mean "quick to act or to do what is required" or "done, spoken, etc. at once or without delay." *See West Valley View, Inc. v. Maricopa County Sheriff's Office,* 216 Ariz. 225, 230, 1121 (App. 2007) ("Because the statute does not define 'promptly' we turn again to a dictionary, which defines 'prompt' to mean 'quick to act or to do what is required' or `done, spoken, etc. at once or without delay.")

Please contact undersigned directly if you need additional information or seek clarification of our requests

I appreciate your prompt attention to this matter.

Very truly yours,

**CANTELME & BROWN, P.L.C.**

D. Aaron Brown

cc.    Lillian Cocreham
       Cris Meyers, Esq., Phoenix City Attorney

EXHIBIT 2

| | |
|---|---|
| **From:** | Joe Encinas |
| **Sent:** | Wednesday, May 5, 2021 4:40 PM |
| **To:** | maria.palomino@phoenix.gov |
| **Cc:** | Joe Encinas |
| **Subject:** | FW: Public Records Request PPD-PR2021259475 PPD:0046410 |
| **Attachments:** | City of Phoenix public records request for Juarez 01.26.21.pdf |

Maria, I am following up for Aaron with our record requests, (Officer Juarez)See below.
I have also attached a previous letter discussing the scope of our request.
Please call me so we may discuss in detail the scope of our request.
Thank you very much

**From:** Police Public Records PPD <policepublicrecords@phoenix.gov>
**Sent:** Monday, May 3, 2021 2:39 PM
**To:** Aaron Brown <Aaron@cb-attorneys.com>
**Subject:** Public Records Request PPD-PR2021259475 PPD:0046410

Good Afternoon,

Your Public Records Request PR2021259475 for email records between City of Phoenix and Officer Adrian Juarez has produced over 1,559 items. The search terms that was used is "Adrian Juarez #10097." Can you please refine the search terms so we can narrow down the results? Please give us keywords and terms for the search.

You may reply to this email with the information of call our office at 602-534-1127.

Thank you,

Gabriela Palomino
Public Records Team
Public Records and Services Unit
1717 E. Grant St. Ste 100
Phoenix, AZ 85034
Mon-Fri 8am to 4pm
602-534-1127

This Public Record Request has been assigned to the PPD ESB Requests queue.

The following information is regarding this request:

**Service Request #:** PPD-PR2021238060
**Service Request Type:** Other
**Request SubType:** ESB Record
**Requestor Name:** Kimberly Bonnell
**Incident Report#:**
**Date Submitted:** 2/10/2021 11:19 PM
**Request Status:** Submitted
**Request Origin:** Mail
**Case Agent:**
**Start Date:**
**End Date:**
**First Name Involved Party:** Adrian
**Last Name Involved Party:** Juarez
**Location / Description:** Job Application including polygraphs, background checks, resume, and job description/responsibilities for Officer Adrian Juarez #10097

Please process the request accordingly and assign it to the **PPD Public Records Return** queue when completed.

Thank you,
Public Records, Code Enforcement Unit
Phoenix Police Department
1717 E Grant St, Suite 100
Phoenix, AZ 85034
(602) 534-1127
Monday-Friday 8am to 4pm

EXHIBIT 3

# CANTELME & BROWN, P.L.C. LAWYERS

D. Aaron Brown
dbrown@cb-attorneys.com

A PROFESSIONAL LIABILITY CORPORATION
2020 S. MCCLINTOCK DRIVE, SUITE 109
TEMPE, ARIZONA 85282

Direct (602) 200-0105
Main (602) 200-0104
Facsimile (602) 200-0106

**CONFIDENTIAL & PRIVILEGED**
**ATTORNEY-CLIENT COMMUNICATION**
**ATTORNEY WORK PRODUCT**

February 23, 2021

Public Records and Services Unit
City of Phoenix
1717 E. Grant Street, Suite 100
Phoenix, Arizona 85034

Dear Public Records and Services Unit Representative:

Cantelme and Brown, P.L.C. Law Firm represents Lilian Cocreham in connection with the shooting deaths of her two sons, George Cocreham and Emmett Cocreham, at the hands of City of Phoenix Police Officers, on October 20, 2020, at Ms. Cocreham's home, located at 2210 E. Amelia Avenue, Phoenix.

The City of Phoenix has legal obligations to not prejudice the rights of our client. If you have counsel, please have them contact us immediately.

This correspondence serves as a follow up to our client's records requests of January 13, 2021 through current date. To date, we only received 903 photos and seven Body Cam Videos which are so redacted that we cannot identify whom the subject is in some of the photos. My office called four times to ask for assistance from the Records Department and the Records Department claims that they cannot provide the name of the subject in the redacted photos. By way of this letter, I am requesting a phone call immediately to address this concern.

There is a complete absence of records for the City of Phoenix Police Department polices, practices, procedures; along with the following overdue records:

- Air Unit Records
- Recorded Interviews of **all** Officers at time of incident
- On Body Camera Video

- Investigation Reports
- Supplemental Reports
- Computer aided dispatch logs
- 911 Calls
- Radio traffic
- Call logs
- Premise history
- Witness statements
- Images
- Videos
- Audio Recordings
- Internal Investigation Reports
- Administrative Investigations
- Third Party Investigations

**Records for Juarez, Adrian - 10097**

- Officer photos
- History file
- Department file
- Firearm training records
- Division file
- Physical file
- Job application
- Polygraphs
- Background checks
- Resume
- Job application
- Job Description
- Correspondence between City of Phoenix and Officer Juarez
- Internal Investigation Reports
- Discipline Reports
- Discharge Firearm Reports
- Weapons Records
- Training Records
- Fiscal File

CONFIDENTIAL & PRIVILEGED
ATTORNEY-CLIENT COMMUNICATION
ATTORNEY WORK PRODUCT

- Pay and Compensation

**Records for Dohan, Laker –**
**Badge # 10068**

- Officer photos
- History file
- Department file
- Firearm training records
- Division file
- Physical file
- Job application
- Polygraphs
- Background checks
- Resume
- Job application
- Job Description
- Correspondence between City of Phoenix and Officer Dohan
- Internal Investigation Reports
- Discipline Reports
- Discharge Firearm Reports
- Weapons Records
- Training Records
- Fiscal File
- Pay and Compensation

Arizona law defines "public records" broadly and creates a presumption requiring the disclosure of public documents. *See Carlson v. Pima County*, 141 Ariz. 487, 489-90, 687 P.2d 1242, 1244-45 (1984). Section 39-121 of the Arizona Revised Statutes affirms the presumption of openness, stating that public records and other matters in the custody of any officer shall be open to inspection by any person at all times during office hours. *See Griffis v. Pinal County*, 215 Ariz. 1, 156 P. 3d 418 (2007). A.R.S. § 39-121.01(D)(1) requires the public agency to "promptly furnish" copies of records. Court have interpreted "prompt" under the statute to mean "quick to act or to do what is required" or "done, spoken, etc. at once or without delay." *See West Valley View, Inc. v. Maricopa County Sheriff's Office*, 216 Ariz. 225, 165 P. 3d 203 (2007).

CONFIDENTIAL & PRIVILEGED
ATTORNEY-CLIENT COMMUNICATION
ATTORNEY WORK PRODUCT

It's been almost six weeks since our first request. We have followed up multiple times. This delay is not a prompt response. Further, the fact that we have been told that the records have been reviewed multiple times, as well as your prompt response in providing some records, indicates that you have had sufficient time to promptly respond with all the records requested. If we do not receive all requested records by March 5, 2021, or an acceptable explanation as to why further delay is required, we will file a public records suit and seek attorney fees and costs for doing so.

You are again hereby advised that you have a legal duty to retain, protect and preserve all evidence pertaining to this incident, surrounding events and claim. Any failure on your part to properly preserve evidence, or any action on your part to destroy any available evidence, will lead to potential adverse consequences to you and your officers, including, without limitation, giving rise to a legal presumption that the evidence would have been harmful to your side of the case. The destruction, alteration or loss of any of evidence may constitute spoliation under the law. If you fail to preserve and maintain evidence, we will seek sanctions.

Please also consider this letter our request that you preserve any and all evidence related to this matter, including employment records and written statements of witnesses and/or employees. Please also preserve all photographic, video and/or audio records of the incident and events prior thereto.

I appreciate your quick to act, prompt response. Please contact us if you need additional information or seek clarification.

Please call me if you have any questions or concerns.

Very truly yours,

**CANTELME & BROWN, P.L.C.**

By: D. Aaron Brown

CONFIDENTIAL & PRIVILEGED
ATTORNEY-CLIENT COMMUNICATION
ATTORNEY WORK PRODUCT

EXHIBIT 4

**CANTELME BROWN,** LAWYERS

David J. Cantelme
david@cb-attorneys.com

A PROFESSIONAL LIABILITY CORPORATION
2020 S. MCCLINTOCK DRIVE, SUITE 109
TEMPE, ARIZONA 85282

Direct (602) 200-0125
Main (602) 200-0104
Facsimile (602) 200-0106

June 1, 2021

Chris Meyer, Esq.
Phoenix City Attorney
200 West Washington Street
Phoenix, Arizona 85003

Dear Mr. Meyer:

As you probably know from our service of a notice of claim on the City of Phoenix in this case, my law firm and I represent Lillian Cocreham in connection with the death of her two sons, George Cocreham and Emmett Cocreham, on October 20, 2020, at Ms. Cocreham's home, located at 2210 E. Amelia Avenue, Phoenix. As you doubtless are aware, the Maricopa County Medical Examiner has ruled that both deaths were homicides.

This correspondence follows up our previous requests to the City of Phoenix Police Records Department for public records. The Records Department either has not responded at all or is slow-walking its response. My office has called several times to ask for assistance from the Records Department, and in response the Records Department claims that they are processing the requested records. But nothing ever happens. Thus, I am escalating these public records requests to your attention.

As you know, Arizona law defines "public records" broadly and creates a presumption requiring the disclosure of public documents. *Carlson v. Pima County*, 141 Ariz. 487, 489-90 (1984). A.R.S. § 39-121 affirms the presumption of openness, stating that public records and other matters in the custody of any officer shall be open to inspection by any person at all times during office hours. *Griffis v. Pinal County*, 215 Ariz. 1 (2007). A.R.S. § 39-121.01(D)(1) requires the public agency to "promptly furnish" copies of records. Courts have interpreted "prompt" under the statute to mean "quick to act or to do what is required" or "done, spoken, etc. at once or without delay." *West Valley View, Inc. v. Maricopa County Sheriff's Office*, 216 Ariz. 225 (2007).

I specifically ask for your assistance in securing the Air Unit Records, covering the service call to 2210 E. Amelia Avenue Phoenix, Arizona, on October 20, 2020, including the helicopter video recording of this service call, the helicopter log, the in-flight records relating to this service call, *i.e.* when the helicopter took off and when it landed, and the

helicopter audio communications for this call. All of these items fall within the definition of public records, and the City has a legal duty to produce them. To date, it has failed to comply with or satisfy this legal duty. Please advise when the City will make these records available.

Please also consider this letter our request that the City preserve any and all evidence related to this matter.

I appreciate your prompt response. Please contact me if you need additional information or seek clarification.

Thank you for your attention to these matters.

Very truly yours,

**CANTELME & BROWN, P.L.C.**

By: David J. Cantelme

CANTELME & BROWN, P.L.C. | LAWYERS

David J. Cantelme
david@cb-attorneys.com

A PROFESSIONAL LIABILITY CORPORATION
2020 S. MCCLINTOCK DRIVE, SUITE 109
TEMPE, ARIZONA 85282

Direct (602) 200-0125
Main (602) 200-0104
Facsimile (602) 200-0106

June 14, 2021

Chris Meyer, Esq.
Phoenix City Attorney
200 West Washington Street
Phoenix, Arizona 85003

Re:   Claim of Lily Cocreham for the Homicides of
      Emmett Cocreham and George Cocreham

Dear Mr. Meyer:

As you know from recent correspondence and from our service of a notice of claim on the City of Phoenix in this case, my law firm and I represent Lillian Cocreham in connection with the death of her two sons, George Cocreham and Emmett Cocreham, on October 20, 2020, at Ms. Cocreham's home, located at 2210 E. Amelia Avenue, Phoenix. As you doubtless are aware, the Maricopa County Medical Examiner has ruled that both deaths were homicides.

This correspondence follows up our previous requests to the City of Phoenix Police Records Department for public records. My office previously requested and received the incident photographs and Police Body Cams but with considerable redactions. Thus, I am escalating these public records requests to your attention for release of unredacted versions of the body cams.

As you know, Arizona law defines "public records" broadly and creates a presumption requiring the disclosure of public documents. *Carlson v. Pima County*, 141 Ariz. 487, 489-90 (1984). A.R.S. § 39-121 affirms the presumption of openness, stating that public records and other matters in the custody of any officer shall be open to inspection by any person at all times during office hours. *Griffis v. Pinal County*, 215 Ariz. 1 (2007). A.R.S. § 39-121.01(D)(1) requires the public agency to "promptly furnish" copies of records. Courts have interpreted "prompt" under the statute to mean "quick to act or to do what is required" or "done, spoken, etc. at once or without delay." *West Valley View, Inc. v. Maricopa County Sheriff's Office*, 216 Ariz. 225 (2007).

I am specifically asking for your assistance in **providing <u>unredacted</u> copies of incident photographs and Police Body Cam Videos**, covering the service call to 2210 E. Amelia Avenue Phoenix, Arizona, on October 20, 2020. These items fall within the

definition of public records, and the City has a legal duty to produce them. To date, it has failed to comply with or satisfy this legal duty. Please advise when the City will make these records available.

Please also consider this letter our request that the City preserve any and all evidence related to this matter.

I appreciate your prompt response. Please contact me if you need additional information or seek clarification.

Thank you for your attention to these matters.

Very truly yours,

CANTELME & BROWN, P.L.C.

By: David J. Cantelme